## CHARLESTON.

### BANK OF HUNTINGTON *v.* NAPIER *et al.*

Submitted September 16, 1895—Decided Dec. 7, 1895.

1.  SALE—DELIVERY—BAILEE.
       When logs are delivered, measured, and branded with the brand of the purchaser, at a point or place of delivery in strict accordance with the unequivocal stipulations of the written contract of purchase, the sale is complete, and the title passes to and vests in the purchaser, notwithstanding other provisions in such written contract by which the seller agrees for a fixed compensation safely and without loss or damage to deliver such logs at another and different point for the purchaser.    As to the latter part of the contract, the original seller becomes the bailee or agent of the purchaser to secure a safe delivery of the logs, and is in no wise reinvested with the title to or property in such logs

2.  INSTRUCTIONS—APPELLATE COURT.
     Where, on critical examination, an instruction is susceptible of more than one construction or meaning, the court will adopt that which, in the exercise of ordinary good sense, was evidently given to it by the trial court and jury.

3.  VERDICT—EVIDENCE—INSTRUCTIONS.
     On consideration of the whole evidence, as required by legislative enactment, if it appear that the verdict of the jury is sustained by a decided preponderance thereof, the court will not set aside such verdict because the trial court may have given im-

proper or refused proper instructions, not interfering with or affecting the preponderance of evidence, for such erroneous rulings must be deemed to be harmless error.

4. REVERSAL—JUDGMENT—HARMLESS ERRORS.

Where, on consideration of the whole record, the judgment is plainly right, the court will not reverse the judgment for errors of law, which, if not committed, would n )t have produced a different result.

SIMMS & ENSLOW for plaintiff in error, cited 28 W. Va. 1; 100 U. S. 124; 89 Ill. 566.

CAMPBELL & HOLT for defendant in error, cited 10 Otto, 124.

DENT, JUDGE:

This suit grows out of the claim of C. Crane & Co., a corporation, made to fourteen rafts of timber levied on by the sheriff of Wayne county under an execution issued January 5, 1895, against W. S. Napier. The timber levied on was in Twelve Pole creek, near the mouth thereof, and was claimed by C. Crane & Co. The Bank of Huntington claimed the property as W. S. Napier's, and gave a bond of indemnity to the sheriff, and Crane & Co. gave a suspending bond to suspend the sale until the rights of the property could be determined, and on the 7th day of February, 1895, Crane & Co. filed their petition, claiming the property. To this petition the Bank of Huntington filed its answer, and on the 6th day of February a jury was impaneled to try the rights of the property, which jury, on the 7th day of February, returned a verdict in favor of the claimants, which verdict the execution creditor, the Bank of Huntington, asked to be set aside as contrary to the law and evidence. This was refused, and judgment rendered against the right of the bank to levy the execution upon the timber, and to such judgment of the Circuit Court of Wayne county, the Bank of Huntington obtained a writ of error.

In argument the following errors are insisted on, to wit: (1) The giving of the three instructions for defendent in error; (2) the refusal to give instruction No. 4 for plaintiff in error; (3) the overruling of the motion to set aside the verdict as contrary to the law and evidence.

The facts, as adopted from the brief of Campbell & Holt, attorneys for defendant in error, are as follows, to wit:   C. Crane & Co., a copartnership of Cincinnati, Ohio, engaged on a large scale in the lumber business, on the 10th day of June, 1891, entered into a contract in writing with M. B. Goble and W. S. Napier, whereby the latter sold to C. Crane & Co. certain timber to be hauled in Twelve Pole for certain prices specified, and among other stipulations it was especially agreed that said timber should be branded with a brand of C. Crane & Co., and when measured and so branded the timber should become and be the property of C. Crane & Co.  Considerable timber was gotten out, measured and branded under this contract up to the 11th day of November, 1891, when M. B. Goble failed in business. Goble's failure necessitated his dropping out of the contract.  Accordingly, on the 11 day of November, 1891, another memorandum of agreement was made, whereby it was agreed "that all further transactions in regard to said timber contract shall be directly between C. Crane & Co. and W. S. Napier, instead of between M. B. Goble and W. S. Napier."  When this contract was signed, to wit, on the 11th day of November, 1891, C. Crane & Co. had measured and branded twenty seven thousand dollars worth of timber, and paid for it.  In operating under the contract of June 10, 1891, C. Crane & Co. would send out their agent each month to inspect, brand, and receive the timber, and make up a proper statement of the amount due therefor, and these amounts were paid to M. B. Goble.  After Goble failed, and had dropped out of the contract, the same method was pursued for three or four months with W. S. Napier, when C. Crane & Co. learned that W. S. Napier had become insolvent by reason of his indorsements of Goble's paper prior to his failure, and that when money was sent to W. S. Napier by C. Crane & Co. to pay for the timber, certain of Napier's creditors seized on it, thus preventing it from going to the haulers and producers of the timber, and disabling Napier from carrying out his contract. The haulers and producers of the timber would not deliver the timber to W. S. Napier till they received their pay. Thereupon the mode of transacting the business was

changed so that the price of the timber delivered under the contract was paid direct by C. Crane & Co. to the haulers. This change was necessary in order to continue the business.

C. Crane & Co. bought other timber in Twelve Pole; some from S. S. Vinson,—about eight thousand logs; and some from Asbury Jackson,—about six thousand logs. W. S. Napier was in no way connected with these purchases, except he agreed to drive, raft, and deliver it at Cincinnati for a price.

C. Crane & Co. also bought a large number of standing trees —about fourteen thousand — and branded them. Most of these—about eleven thousand—were cut and hauled into Twelve Pole. W. S. Napier had no money or interest in these standing trees, except to drift when put into the water.

C. Crane & Co., on finding Napier without means, entered the creek, and paid directly to laborers and others the money for drifting, splashing, booming, rafting, and towing all the timber gotten out. Napier invested nothing in any of this timber except labor in procuring people to haul, and in helping to drift, *etc.*

In January, 1895, about fifteen thousand of these logs were run out to the boom at the mouth of Twelve Pole, and were being rafted preparatory to being towed to Cincinnati, when they were levied on under the executions aforesaid as the property of W. S. Napier.

The question presented to the court is whether the timber in controversy at the time of the levy was in good faith the property of C. Crane & Co., or whether the arrangement between said company and W. S. Napier was entered into and carried on as a device to hinder, delay, and defraud the creditors of the latter. As to the former question, the burden is on the plaintiff company ; as to the latter, it is on the defendant, the Bank of Huntington.

The following are the contracts under which the logs are claimed, to wit:

"Cattlettsburg, Ky. June 10, 1891. I have this day sold and agree to deliver to M. B. Goble all the oak I may haul on 12 Pole creek and tributaries; also all the poplar, to wit:

from 20 to 30 thousand saw logs, to be sound, good, merchentable saw logs, to be delivered on the bank of said streams, where they can be run out, for 7 cents per cube foot; and said logs are to be branded C. C. & Co.—that is C. Crane & Co's brand—and paid for by them, C. Crane & Co., for M. B. Goble; and when said logs are branded, then they are the property of said C. Crane & Co. And also all the poplar is to go in on the same basis of 7 cents per cube for said poplar on the bank; and I further agree to drift said oak, raft and deliver said timber—that is, the oak—for the further sum of 5 cents per cube; and that all poplar below 24″ in diameter 5 cents for the delivery and 24″ and up 8 cents cube for the rafting and running; and any loss of timber by floods or otherwise is to be taken out of the amount for delivery, to be delivered at Cincinnati, O. Measurements to be made on the same basis of last year. Advancement to be made as the timber is hauled after July 1st, 1891, as the timber is hauled for which said C. Crane & Co. is to give their paper for said timber as measured on the bank of 12 Pole creek and its tributaries; and I agree to stand discount until timber is delivered. Now, this is fully understood: That Wm. Napier sells this timber to M. B. Goble, and I, M. B. Goble, sell it to C. Crane and Co., and we all agree and concur and sell timber to C. Crane & Co., and the advancements on the purchase are to be made to M. B. Goble, and he pays W. S. Napier, and Napier and Goble are both bound to deliver said timber to C. Crane & Co. Any money paid them above mentioned we are to stand discount or interest until after timber is delivered. Any paper given after delivered and advancement paid, C. Crane & Co. is to stand the discounts. W. S. Napier. M. B. Goble. C. Crane & Co."

"I, W. S. Napier, have received from C. Crane & Co., of Cincinnati, Ohio; through M. B. Goble, $66,320.70 on 12 Pole timber contract. It is now agreed that all further transactions in regard to said timber contract shall be had directly between C. Crane Co. and W. S. Napier, instead of between M. B. Goble and W. S. Napier. W. S. Napier, C. Crane & Co. M. B. Goble. Catlettsburg, Ky., Nov. 11th, 1891."

"Wayne, W. Va., March 1st, 1893. Article of agreement entered into between Asbury Jackson, of Wayne county, West Virginia, of the first part, and C. Crane & Co., of Cincinnati, Ohio, of the second part. Whereas, the first party has purchased what is known as the 'Duval Lands,' and agrees to furnish unto the second party by the first day of March, 1894, ten thousand saw logs, prices as follows: Poplar 20″ and up, 10 cents per cube; good smooth oak (white oak), 8 cents per cube. When timber is to be splashed, the price of oak is to be 7 cents and the price of the poplar 9 cents. The timber, when it is to be splashed, is all to be skelped or pealed, and nothing longer than 30 feet; all to be smooth, clear, and merchantable timber. The timber is to be delivered into the ponds of the splash dams now owned and operated by W. S. Napier. Timber all to be well butted. The second party is to furnish as advancements three thousand dollars by the first day of April, 1893, which is to be taken out of the measurements of the timber as it is taken up and branded. Three cents per cubic foot until the three thousand dollars is paid. In case the second party wants any further security, they have a right to count and brand as many as five thousand trees to secure them in payment of the aforesaid three thousand dollars. Measurements to be made every 30 or 60 days. The above timber is to come into 12 Pole creek and its tributaries, all lying in Wayne county, W. Va. Asbury Jackson. C. Crane & Co."

"Received of C. Crane & Co., this day, March 1st, 1893, 40 days' acceptance for $3,000 (three thousand dollars) on the above contract. Asbury Jackson."

Defendent in error further proves that it was the custom in keeping its books to charge W. S. Napier up with all the timber measured and branded at the mouth of Twelve Pole, and then credit him with the same, after measurement and proper deductions, when delivered at Cincinnati; that it first furnished him with the money to pay for the getting out and hauling the timber, but, after he became involved, to keep the money from being attached as Napier's by his creditors, plaintiff sent it by an agent of its own, to pay directly to the haulers and the men entitled to it. The law

governing the case is not in dispute, and is to the effect that "whether a sale of personal property is complete or only executory is to be determined from the intent of the parties as gathered from the contract, the situation of the thing sold; and the circumstances surrounding the sale." *Morgan* v. *King*, 28 W. Va. 1; *Hatch* v. *Oil Co.*, 100 U. S. 124; *Callaghan* v. *Myers*, 89. Ill. 566.

In examining the written instrument or agreement in controversy, we find it contains two separate and distinct contracts requiring two separate deliveries of the property which is the subject of sale. The first is the contract of sale, and is as follows, to wit: "I have this day sold and agree to deliver to M. B. Goble all the oak I may haul on Twelve Pole creek and tributaries; also all the poplar, to wit, from 20 to 30 thousand saw logs, to be sound, good, merchantable saw logs, to be delivered on the banks of said streams, where they can be run out, for 7 cents per cube foot; and said logs are to be branded C. C. & Co.— that is C. Crane & Co.'s brand—and paid for by them, C. Crane & Co., for M. B. Goble; and when they are branded, then they are the property of C. Crane & Co. * * * Advancements to be made as the timber is hauled after July 1st, 1891, * * * for which said C. Crane & Co. is to give their paper for said timber as measured on the bank of Twelve Pole creek and its tributaries." This is a complete contract of sale. It provides for the price, fixes, a place of delivery certain and definite for such articles as saw logs, provides for their measurement, and the payment of the price agreed, and then that they shall be branded with the brand of C. Crane & Co., and from that time they are to be the purchasers' property. And when, in pursuance thereof, the logs are delivered at the place specified, and properly branded, they become absolutely the property of C. Crane & Co.

If there were no other provisions than the foregoing, the counsel for the bank would certainly admit the completeness of such a sale. But they claim that this part of the agreement is so modified by the other provisions thereof as to prevent the sale from being complete on the first delivery of the logs at the mouth of Twelve Pole. They

fail to separate and distinguish the two distinct contracts covered by the written instrument, for the reason that they are apparently intermingled as one. This second is not a contract of sale but of agency, and is in these words: "And I further agree to drift said oak, raft and deliver said timber— that is, the oak—for the further sum of 5 cents per cube; and that all poplar below 24″ in diameter 5 cents for the delivery and 24″ and up 8 cents cube for the rafting and running and any loss of timber by floods or otherwise is to be taken out of the amount for delivery to be delivered at Cincinnati, O." After selling the timber delivered, measured and branded on Twelve Pole and its tributaries, W. S. Napier undertakes for an agreed price to deliver it safely and in good condition to C. Crane & Co. at Cincinnati, Ohio, and thereby he in no sense extends his ownership of the logs, but becomes the agent of C. Crane & Co. for the safe transportation of their property from the place of original delivery to another point where they wish to make use of it for a compensation sufficiently large to operate to some extent as insurance, or at least to secure prompt and efficient compliance therewith, and prevent loss and destruction.

If these two contracts had been made with separate individuals, no one for a moment would entertain the notion that the latter gave the agent any interest in or title to the timber embraced in the first. Why should it make any difference whether a person contracts with two separate individuals or with one individual in two distinct or separate capacities, namely, a seller of goods and an agent to deliver goods? Can not a merchant go to a farmer's orchard and buy his apples, have them put in barrels, and marked as his property, and then employ the farmer to deliver them at his store for a safe compensation, at his, the farmer's, risk for failure to deliver in good time and in good condition? Such contracts are not uncommon. The contract in the present case was of that nature, not only on its face, but as explained and supported by the oral testimony, the circumstances, and the conduct of the parties.

There is not the slightest evidence tending to prove that this contract, when originally entered into, was intended to delay, hinder, and defraud creditors. But the bank in-

sists that because the manner of paying the owners and haulers of the timber was changed so that the money would not pass through the hands of W. S. Napier to be seized by his creditors, but would go direct from C. Crane & Co. to those justly and rightfully entitled to it, this was a scheme to defraud creditors. It has always been considered proper and equitable that, where property of any kind is purchased through another, the real purchaser, when he finds the owner will not surrender possession of the property until payment, may pay the stipulated price to the owner, although the effect thereof may apparently be to prevent the creditors of the nominal purchaser from seizing the money to pay their debts. It is not his money. Then why should his creditors have it, especially if by so doing they prevent the consummation of the sale?

Certain boastful statements of W. S. Napier as to what he owned on Twelve Pole are introduced in evidence. These, having been made in the absence of C. Crane & Co., can not be used against them. Napier says in explanation of these: "I was talking on the bright side of the case all the time to my creditors. I did not go around telling them I was in a hole. I was trying to keep them off of me." It is also in evidence that C. Crane & Co. informed some of Napier's creditors that they had changed the contract so as to prevent such creditors from attaching the money. Their real object in doing so was to pay it directly to the "natives," as Napier calls them, justly entitled to it, and who would not deliver the timber unless it was so paid. It is also in evidence that one of these "natives" went to C. Crane & Co. to sell his timber, and they told him to go to W. S. Napier. They explained the reason for this was, they did not want to purchase it unless Napier would take charge of and drift it under the contract.

Viewing the evidence as a whole, it clearly, plainly, and decidedly preponderates in favor of the verdict; and in such case, even though the court may have erred in its instructions to the jury, their verdict ought not to be set aside, as such error could not be considered prejudicial, but is harmless in its nature.

As to the instructions of plaintiff in error, if the court

committed error it was not in refusing to give the fourth instruction asked, but in giving the three instructions in these words, to wit:   "No. 1.   The court instructs the jury that if they are satisfied, from all the evidence and the facts and circumstances in this case, the arrangement between C. Crane & Co. and W. S. Napier was a device entered into between them for the purpose of concealing the property of said Napier, and placing it beyond the reach of said Napier's creditors, and that the logs and timber in controversy in this proceeding were and are in truth and in fact the property of W. S. Napier, then they must find for the Bank of Huntington upon the issue herein, and that the property in the petition is not the property of C. Crane & Co.  No. 2.  The jury is instructed that if they believe from all the evidence and circumstances in this case that the logs and timber in controversy in this proceeding were in fact the logs and timber of W. S. Napier until the same should be by said Napier delivered to and measured by C. Crane & Co. in Cincinnati, Ohio, and that said logs and timber have not been so delivered to and measured by said Crane & Co. in Cincinnati, Ohio, and were not at the time of the levy of the execution in the petition in this proceeding, then they must find for said Bank of Huntington upon the issue joined herein.  No. 3.   The court further instructs the jury that the burden of proof in this proceeding is upon the petitioner, C. Crane & Co., to establish the ownership of the logs and timber in controversy, and before they can find that said logs and timber are the property of C. Crane & Co. they must be so satisfied by a preponderance of the evidence; and unless they are so satisfied they must find for the Bank of Huntington upon this issue."   Not that they do not propound the law, but for want of sufficient evidence to justify them.   As we have seen, there is virtually no evidence to justify the imputation of fraud so far as C. Crane & Co. are concerned; and if the jury, misled by these instructions, had found a verdict in favor of the bank, it would have been the duty of the court to promptly set it aside as contrary to the law and evidence.   The fourth instruction relates to the question of fraud also.

The first instruction given for the defendent in error is as follows, to wit: "No. 1. If the jury find from the evidence in this case that a part of the 14 rafts of timber levied upon by virtue of executions in favor of the Bank of Huntington against W. S. Napier was hauled to the banks of the drifting or splashing water, was there measured and branded by said C. Crane & Co. under the contracts read in evidence dated, respectively, June 10, 1891, and November 11, 1891, and was drifted to and rafted at the mouth of Twelve Pole creek, then such timber passed to and became the property of C. Crane & Co., and the jury should so find by their verdict." The counsel for plaintiff in error insist that this instruction is bad, because the latter part of it does not limit the finding to that part of the timber referred to in the beginning, but directs the jury, if they find as to part, they should find as to all. This seems to be a discovery made by the counsel after the trial, and it must have been a surprise to them when they made it, as no ordinary mind, on first reading the instruction, would think of giving it such a construction. But after a person once sees it, it is like the woman's profile in the moon, it is impossible to see anything else. Nevertheless the court, counsel, and jury understood the instruction, as it was intended to be given, as referring both in the beginning and end to only part of the timber; and this Court will have to give to it the same meaning as the jury understood it to have. In such case, with such meaning, it was properly given.

The further objection to the defendant in error's instructions hinges on the distinction raised by the plaintiff in error's counsel between C. Crane & Co. as a partnership and as a company or corporation. At the beginning of the contracts in controversy C. Crane & Co. was a partnership. They afterwards became a corporation by the same name, which succeeded to all the rights of the former partnership under these timber contracts. Such being the case, when they or it are referred to in these instructions, and indeed in the record, evidence, and even this opinion the name C. Crane & Co. is intended to cover all timber rights under said contract. The fact that they were once a partnership, and are now a corporation, has nothing to do with the deter-

mination of this case, as it is shown in the evidence that the corporation succeeded to the company's rights, and no person but the partnership would have a right to assail the corporation's title as derived from the partnership, as that is matter entirely between the assignor and assignee, and suit is proper in the name of either; and as the partnership was merged in the corporation, this can be considered virtually a suit by both under one name.

These objections to instructions are purely technical, and do not affect the merits of the controversy. It now being made the duty of the court to consider the whole evidence by legislative enactment, instructions, whether improperly given or improperly refused, are relegated to a position of minor importance, for the first inquiry must necessarily be as to whether the verdict of the jury is sustained by a decided preponderance of the evidence; and, if such a determination is reached, all errors of law committed by the court during the trial must be placed in the category of harmless errors, unless they are so gross that a different ruling would have materially weakened or destroyed the preponderance of evidence.

There was no such error, if any, committed herein, and, as a clear and decided preponderance of the evidence supports the finding of the jury that C. Crane & Co. were the true owners of the timber in controversy at the time it was levied on by virtue of the plaintiff in error's executions, this Court can not do otherwise than affirm the judgment on the verdict, which is accordingly done.