## CHARLESTON.

WEBB v. BIG KANAWHA & O. R. PACKET CO.

(BRANNON, JUDGE, *concurring.*)

Submitted January 20, 1897—Decided November 17, 1897.

1. EVIDENCE—*Illegal Evidence—Reversal.*
   When illegal evidence is admitted against the objection of a party, it will be presumed that it prejudiced such party; and, if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for reversal of the judgment. *Taylor* v. *Railroad Co.*, 33 W. Va. 40 (10 S. E. 29); *Insurance Co.* v. *Trear*, 29 Grat. 259. (p. 805.)

2. EVIDENCE—*Conflicting Evidence—Instructions—Error.*
   When there is conflict of testimony, and evidence on one side supporting one theory, and evidence on the other side supporting another and conflicting theory, and the principles of law applicable to each theory are different, it is error for the court to give as instructions to the jury abstract propositions of law which are applicable to only one of said theories, without any reference in such instructions to the evidence in the case. (p. 808.)

Error to Circuit Court, Kanawha County.

Trespass on the case by Samuel L. Webb against the Big Kanawha & Ohio River Packet Company. Plaintiff had judgment. Defendant's motion to set aside the verdict and grant a new trial was overruled, and he brings error.

*Reversed.*

COUCH, FLOURNOY, PRICE & SMITH and BROWN, JACKSON & KNIGHT, for plaintiff in error.

WARTH & BRIGGS and MOLLAHAN & McCLINTIC, for defendant in error.

McWHORTER, JUDGE:

This is an action of trespass on the case, brought by Samuel L. Webb at May rules, 1895, in the Circuit Court of Kanawha County, against the Big Kanawha & Ohio River Packet Company, to recover damages for personal injury received on the defendant's steamer T. D. Dale on or about the 10th of December, 1894, while a passenger on said steamer on the Kanawha river, by the alleged careless and negligent handling by the employees of defendant of a stage plank, which was carelessly and negligently thrown upon one of the plaintiff's feet, mashing, bruising, and injuring it. The defendant appeared, and demurred to the declaration, and to each count, which demurrer was overruled. The case was tried before a jury on a plea of not guilty, at the March term, 1896. After the evidence was all in, the plaintiff submitted eight instructions, numbered 1 to 8, inclusive, to each and all of which defendant objected, which objections were overruled, and all of said instructions given to the jury, to which ruling of the court the defendant excepted. The defendant then asked nine instructions, numbered 1 to 9, inclusive, to the giving of which, and each of them, the plaintiff objected; but the court overruled the objections to instructions numbered 1, 2, 3, and 4, and permitted them to go to the jury, and sustained the objections to Nos. 5, 6, 7, 8, and 9, and refused to give the same to the jury; to which ruling of the court in refusing said last-named instructions the defendant excepted. The jury returned a verdict for the plaintiff, assessing his damages at four thousand dollars, when the defendant moved the court in arrest of judgment on said verdict, and to set aside said verdict, and grant it a new trial, on the ground that said verdict was contrary to the law and the evidence, and that it was excessive, and that the court misinstructed the jury, and refused proper instructions asked for by the defendant; and on the further ground of improper conduct on the part of a member of the jury, and of the plaintiff and some of his witnesses; and in support of said last-mentioned ground defendant filed the affidavits of L. A. Carr, J. M. Thomas, and E. A. Rogers, which affidavits are made part of the record, to which several motions, and each of them, plaintiff objected, and in support of his said objections filed the affi-

davits of Calvary Pauley (the juror), John Holland, W. J. McNealey, S. L. Webb, which are also made part of the record, which said motions in arrest of judgment and for a new trial the court overruled, and rendered judgment upon said verdict on the 2nd day of April, 1896; to which rulings of the court in overruling the motion in arrest of judgment and for a new trial, and in rendering judgment on said verdict, the defendant excepted, and obtained a writ of error that said rulings might be reviewed by this Court.

The first assignment of error is the overruling of the demurrer to the declaration, and to each count thereof. The declaration contains three counts, alleging that defendant is a corporation created and existing under the laws of the State of West Virginia, doing business in the said state as a common carrier, and having an office and place of business in said county of Kanawha; that "on and before the 10th day of December, 1894, the defendant was the owner and operator of a steamer known as the T. D. Dale, and as such was a common carrier of passengers, and was, to wit, on the 10th day of December, 1894, a common carrier for hire and reward to the defendant by and upon said steamer T. D. Dale, from the city of Charleston, in the said county of Kanawha, and State of West Virginia, to the city of St. Albans, also in the said county and state; and the plaintiff alleges that on the said date, to wit, on the 10th day of December, 1894, the defendant, as such common carrier, undertook to carry the plaintiff, and the plaintiff became and was a passenger in and upon the defendant's said steamer, T. D. Dale, for a certain fare and reward to the defendant in that behalf, to be safely carried from the said city of Charleston to the said city of St. Albans; but the defendant, not regarding its duty in that behalf, did not use due and proper care that the plaintiff should be safely carried by and upon said steamer T. D. Dale on said journey, but wholly neglected so to do, in this, to wit: that after the plaintiff had entered on the said steamer T. D. Dale, as such passenger, to be carried as aforesaid by the defendant, and while the said steamer T. D. Dale was about leaving one of the wharf boats at said city of Charleston, and was about to start on the trip down the Kanawha river to the said city of St. Albans, to wit, on the

10th day of December, 1894, as aforesaid, at the county aforesaid, the defendant suffered a heavy stage plank to be negligently and without proper care so handled by the employes of the defendant operating and running the said steamer T. D. Dale that it fell with great force, and struck upon one of the plaintiff's feet, whereby one of his feet was greatly mashed, bruised, wounded, and injured, and whereby the plaintiff was otherwise greatly bruised, wounded and injured, and became and was sick, sore, lame, and disabled, and so continued and still is, and during all said time has suffered great pain, and was prevented from transacting his business, thereby being deprived of the profits of his said business, and suffering the losses occasioned by its neglect; and also did pay out divers sums of money, to wit, amounting to the sum of $1,000, in endeavoring to be cured of the said injury." The second and third counts differ only a little in the manner of the infliction of the injury, but are substantially the same as the first, and laying plaintiff's damages at ten thousand dollars. The declaration fails to negative contributory negligence on the part of the plaintiff; but this Court has frequently held that such allegation is unnecessary, "that being a matter of defense to be alleged and proven, if it exist, by defendant." *Carrico* v. *Railway Co.*, 35 W. Va. 393 (14 S. E. 12); *Sheff* v. *Huntington*, 16 W. Va. 307; *Berns* v. *Coal Co.*, 27 W. Va. 285, point 2, syl. I have examined the declaration carefully, and fail to find any material defect, and the defendant points out none. I conclude, therefore, that the demurrer was rightly overruled.

The second assignment is that it was error to permit the plaintiff, Webb, to be asked and to answer question 9 as set forth in defendant's bill of exceptions No. 1, which question and answer, objections to same, and the ruling of the court thereon, are as follows: "Ninth question: Dr. Miller has testified that he advised you some three or four months after this accident to have an operation performed. Will you please state why you did not follow his advice? (To which question the defendant objected, but the court overruled said objection, and permitted the witness to answer said question, and the witness answered as follows): Ninth answer: The only reason was that I was too poor. I was not able to do so at that time. I am not yet. I was in-

formed by my physician, Dr. Miller, that I would have to be put under the influence of some kind of opiate,—chloroform or ether. He further informed me that it was a very dangerous operation for any one to undergo when one was subject to heart trouble. I had been waiting also to see if I could not get well without undergoing an operation, taking my chances of losing my life; still deferred the matter for those reasons; but most of which I would not have been able to stand the expense of going to Cincinnati. It was very expensive, so I was informed; that it would cost me two or three hundred dollars; also that I would have to take the chances of losing my life, and with the hope that it would get well itself if I deferred it. (To which answer the defendant objected, and asked the court to exclude the same from the jury, but the court overruled said objection and refused to exclude said answer from the jury.)" Plaintiff, in his answer, first gives as his only reason for not having the operation performed that he was too poor, was not able to do so at the time, and was not yet able (at the time of testifying); then proceeded to give in detail what his physician told him, and managed to so tell it that the jury would be led to infer that plaintiff was subject to heart trouble, without stating as a fact that he was. If plaintiff had contented himself with, as he says, the only reason for not having the operation performed,—that he was to poor, and had never become able,—and which was a full and complete answer to the question, although there might apparently be something in defendant's objection that "it was very improper to permit him to parade his alleged poverty before the jury," yet, in view of the effort of defendant, as plaintiff puts it, "to create the impression on the jury that the plaintiff's continued disability was due to his own neglect or disregard of his physician's advice that an operation would be necessary to make the injury get well," it would seem to be right to hear plaintiff's explanation of his apparent neglect to do what was necessary to have done; but it was clearly improper to allow him to go on, and state what the doctor said about the effect of chloroform, ether, *etc.*, and the danger of such "operation for any one to undergo when one was subject to heart trouble." The tendency of his answer was to arouse the sympathy of the jury in his

favor and to the prejudice of the defendant. In *Berkely Peerage Case*, 4 Camp. 415, Mansfield, C. J., says: "In England, where the jury are the sole judges of the fact, hearsay evidence is properly excluded, because no man can tell what effect it might have upon their minds." See also, 1 Whart, Ev. § 172. In *Hall* v. *Lyons*, 29 W. Va. 421, (1 S. E. 591), JUDGE GREEN says: "If a court admit evidence which it ought to exclude, against the protest of the party objecting to its admission, and a verdict is rendered against such party, it will be persumed that he was prejudiced thereby, and therefore such verdict should be set aside on his motion; and, if that be not done, this Court will reverse the case, unless it clearly appears from the record that the plaintiff in error was not prejudiced by the admission of the improper evidence, * * * and it appears that, excluding this improper evidence, the verdict is so plainly right that a different verdict ought, on motion, to have been set aside, and a new trial awarded." In *Taylor* v. *Railroad Co.*, 33 W. Va. 40 syl. point 3, (10 S. E. 29), opinion by JUDGE BRANNON: "When illegal evidence is admitted against the objection of a party, it will be presumed that it prejudiced such party, and, if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for reversal of the judgment; but, if it clearly appears that it could not have changed the result, —that, if it had been excluded the same result would have followed,—it would not be cause for reversing the judgment." So, also, Judge Moncure, in *Insurance Co.* v. *Trear*, 29 Grat. 259, says: "If the only objection to the evidence was its irrelevancy, and it could not properly have prejudiced the defendants, then the judgment ought not to be reversed for the error in not excluding it; for to authorize the reversal of a judgment for error in admitting irrelevant evidence, not only must the evidence be irrelevant, but it must be of such a nature as that its admission may have prejudiced the adverse party. If he may have been so prejudiced, even though it be doubtful whether in fact he was or not, that is a sufficient ground for reversing the judgment." See, also, *Hall* v. *Lyons*, 29 W. Va. 410, syl. point 2, (1 S. E. 582), and *Payne's Case*, 31 Grat. 855.

Third assignment: That the court erred in refusing to permit the time book kept by the witness E. A. Rogers,

who was the clerk of the steamer, showing the employes on the boat during the week, embracing the day on which the accident occurred, to be introduced in evidence to the jury, in order to show that plaintiff's witness Wesley Fields was not on the boat at the time of the accident. There is no error in this, and, if there was, it is not such as defendant can complain of. Witness states that the book shows that Fields was not on the boat, and he also states that the book did not include all the names of all the employes on the boat during the week in which the accident happened; that "there may be one or two that is not on there [on the book]; the rousters are not on there; the fireman's name and my name are not on there." So that, if the book had been introduced, not being a complete record, it would prove nothing that was not proved, unless it showed the name of Fields entered therein, in which case it would contradict the defendant's witness Rogers, who kept the book. But, even if the book had been proved to be a complete record of all the employes on the boat, and the keeper of such record was alive, present, and testifying, the book would be incompetent evidence to go to the jury.

The fourth assignment is that it was error to overrule the defendant's objections to plaintiff's instructions, and giving the said instructions to the jury, especially instructions Nos. 4, 5, and 6, which are as follows: No. 4: "The court instructs the jury that the law, in tenderness to human life, holds common carriers liable for the slightest negligence, and compels them to repel by satisfactory proof every imputation of such negligence. When carriers undertake to convey passengers by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence." No. 5: "The court further instructs the jury that the Big Kanawha & Ohio River Packet Company, as a common carrier of passengers, was bound to exercise the utmost degree of diligence and care in safely transporting the plaintiff, S. L. Webb, upon his journey; and the slightest neglect against which human prudence and foresight might have guarded, and by reason of which his injury may have been occasioned, renders such company liable in damages for such injury." No. 6: "The court

further instructs the jury that the Big Kanawha & Ohio River Packet Company, as a common carrier of passengers, is held by the law to the utmost care, not only in the management of its boats, and handling of its stage planks or other apparatus by means of which passengers enter its boats, but also in performance of all other acts or duties necessary to the safety of passengers." The evidence introduced by the plaintiff tended to show: That on the 10th day of December, 1894, the steamer T. D. Dale landed at the lower wharf boat at the city of Charleston, with her head upstream. That several passengers went on board the boat at that point, among them the plaintiff, S. L. Webb. That said passengers entered upon said steamer from the wharf boat by means of a stage plank, which was some 12 or 14 feet long, 12 inches wide, and 2 or 3 inches thick. That there were a number of passengers ahead of the plaintiff as they passed over said stage plank, he being the last one to go upon the boat, except one man, who was behind him. That he walked off of said plank upon the lower deck, and turned towards the stairway to go up to the upper deck, but was delayed and impeded by the other passengers who were ahead of him; and when near the foot of the stairs the signal was given by some one on the boat to turn her loose and draw in the stage plank. Said plank was picked up by two colored men, deck hands on said steamer, and employees of the defendant, and thrown down, falling upon the instep of one of plaintiff's feet, seriously injuring it. Plaintiff went on home, and was under the care of physicians a long time. That the wound occasioned by the falling of the plank grew worse and worse, the bones became decayed, and at the time of the trial was still discharging matter, and that probably it would never become permanently cured without a surgical operation. That the plaintiff was an attorney at law and a justice of the peace, and was obliged for nearly a year to neglect his business at a loss of probably seventy dollars a month; and that he had spent a considerable amount for doctor bills, medicines, *etc.*, in endeavoring to cure his wound. The evidence for the defendant tended to show: That the steamer Dale came to the landing with her head down the river. That several passengers came on board after the said plaintiff;

and that the plaintiff, instead of going promptly up the stairway to the passenger deck as soon as he came on board, turned off the stage plank in the opposite direction towards the head of the boat, and stood upon the lower deck, talking to some one on the wharf boat, while the other passengers went on up to the passenger deck. That the boat was drifting down stream, when it became necessary to turn her loose quickly and draw in the stage plank. That signals were given for this purpose, and plaintiff was requested to get out of the way of the stage plank and of the employes in the discharge of their duties, but failed to do so. That the stage plank was drawn in by two white deck hands, in the usual and ordinary manner, by taking hold of the end next to the wharf boat, and sliding it back from the boat, letting the end which was held by the deck hands fall; and that when it fell it struck upon the nosen of the boat and bounced on plaintiff's foot, and caused the injury complained of. That under the rules and regulations of the steamer the upper deck was set apart for passengers, and they were not permitted to loiter around or remain upon the lower deck, but were to proceed, upon going on the boat, up the stairs to the passenger deck. That it was dangerous for passengers to stay on the lower deck, or upon the bow of the boat, because of the deck-hands handling freight. That on the lower deck they were liable to get run into, fall overboard, and get in the way of swinging the stage plank in. That the plaintiff, Webb, had frequently traveled upon these boats as a passenger.

As abstract propositions of law, the instructions 4, 5, and 6 are correct, but are they applicable to the case at bar, where the doctrine of contributory negligence is involved? Are they not justly subject in some degree to the criticism of appellant that "they entirely ignore the evidence in the case, especially the evidence favorable to the defendant showing contributory negligence on the part of plaintiff, and that plaintiff had voluntarily placed himself in a position where he 'could not hold the carrier to the full measure of his responsibility for safe carriage'? Beach, Contrib. Neg. § 151." It is contended by appellant "that, where there is a conflict of testimony, there being evidence on one side to support one theory, and evidence on the other side to support another and conflicting theory, and

the principles of law applicable to each theory are different, it is error for the court to give as instructions to the jury abstract propositions of law, which are applicable to only one of said theories, without any reference in said instructions to the evidence in the case"; and it seems to me the proposition is sound. Such instructions are liable to mislead the jury. In *Fisher* v. *Railroad Co.*, 39 W. Va. 371 (19 S. E. 578), JUDGE ENGLISH, in discussing the following instruction: "The court instructs the jury that in the transportation of passengers a railroad company is bound to exercise more than ordinary care and diligence, and is liable for the slightest negligence against which prudence and foresight could have guarded,"—says: "In my opinion, the circuit court erred in giving it to the jury without qualification. While it is true that it is the duty of a common carrier of passengers to use the utmost care in providing for their safety, yet I can well see how a jury might be misled by the instruction referred to. To instruct the jury that in the transportation of passengers a railroad company is bound to exercise more than ordinary care and diligence is a proposition to which we can readily accede; but to add, without qualification, that it is liable for the slightest negligence against which prudence and foresight could have guarded appears to me to have a direct tendency to mislead the jury to the prejudice of the defendant, especially under the state of facts disclosed in this case, unless the jury had been further instructed that the plaintiff could not recover if he himself was guilty of contributory negligence. The facts proven in this case clearly show that the plaintiff was guilty of contributory negligence; and the instruction, taken by itself, leaving out any reference to the question of contributory negligence, would have a strong tendency to mislead the jury, and should not have been given." In the case at bar the evidence of contributory negligence is not so strong, perhaps, as in that case, yet there was considerable evidence tending to prove it which was properly before the jury, and the jury should have been left free to give such evidence the consideration to which it might appear to them to be entitled. "The court is not bound to give an instruction upon a mere abstract question, and, if it does so under circumstances calculated to mislead the jury, such an instruction will be error, for

which the judgment will be reversed." 1 Bart. Law Prac. 656. "If an instruction is given on an abstract question which may mislead the jury, it is an error for which the judgment will be reversed." *Pasley* v. *English*, 10 Grat. 236, point 3. Instruction No. 4 is purely an abstract propoposition of law, good in a case where it is applicable, but calculated to mislead the jury under the circumstances of this case, as shown by the evidence. Instructions 5 and 6 are of the same character, and should not have been given without qualification. It is said by appellee that these instructions were approved in *Searles* v. *Railway Co.*, 32 W. Va. 370. This is true, but the facts in that case were very different from this, as will be readily seen on examining the case, the question of contributory negligence not arising therein, and so were properly approved.

Fifth assignment: That the court erred in rejecting defendant's instructions Nos. 5, 6, 7, 8 and 9, which are as follows: No. 5: "The court instructs the jury that, if they believe from the evidence that the upper deck of the boat was set apart for the passengers, and that under the rules of the boat passengers were expected and required, immediately upon going on board, to go on up to the upper deck, and not remain on the lower deck; and if they further believe from the evidence that the plaintiff, Webb, knew of said regulations, but did not proceed to the upper deck as soon as he might reasonably have done after going on the boat, but remained on the lower deck, and that the employes of defendant drew in the stage plank on the lower deck in the usual manner, and that plaintiff was standing in the way of said plank, and was injured by the plank falling on his foot, and that said injury was not inflicted upon him willfully or wantonly by defendant's employes,* then he can not recover in this action." No. 6: Same as above down to *; then as follows: "Then he can not recover unless they believe that said injury was the result of gross negligence on the part of defendant's employes." No. 7: "The court instructs the jury that if they believe from the evidence that the upper deck of the boat was provided for passengers, and that under the regulations of the boat, passengers were not allowed to remain on the lower deck, and that plaintiff was aware of the regulations, and that the employes of the defendant had certain duties

to perform on the lower deck, among which was taking in the stage plank, and that there was more or less danger to passengers who remained on the lower deck, growing out of the discharge of these duties of said employes, and that defendant was aware of the nature of said duties and of the danger attending their discharge; and if they further believe that plaintiff remained on the lower deck longer than was necessary after he went on board, and was injured while there,*—then he cannot recover in this action, unless they further believe that said injury was done in a willful or wanton manner by defendant's employes." No. 8: Same as above down to *; then as follows: "Then the plaintiff assumed all the risks incident to the discharge of their duties by said employes in the usual and ordinary manner, and if he was injured under such circumstances by the hauling in of the stage plank in the usual and ordinary manner, then he cannot recover, unless they believe that such injury was inflicted upon him willfully and wantonly." No. 9: "The court instructs the jury that, if they believe from the evidence that the upper deck of the boat was provided for passengers, and that under the regulations of the boat, passengers were not allowed to remain on the lower deck, and that plaintiff was aware of this regulation, and that the employes of the defendant had certain duties to perform on the lower deck, among which was taking in the stage plank, and that there was more or less danger to passengers who remained on the lower deck, growing out of the discharge of those duties by said employes, and that plaintiff was aware of the nature of said duties and of the danger attending their discharge; and if they further believe that plaintiff remained on the lower deck longer than was reasonably necessary to enable him to pass from the stage plank to the upper deck, and that he was injured while there by the pulling in of the stage plank,—then he cannot recover in this action, unless they further believe that said injury was the result of gross carelessness on the part of the defendant's employes."

Plaintiff contends "there was absolutely no evidence in the case" tending to prove that Webb "knew of the existence of the rule or regulation referred to in the instructions, and knew the nature of the duties to be performed by the employes of the boat, and the danger attending their

performance." This is true, except by inference drawn from the fact that Webb lived at St. Albans, on the Kanawha river, and from his own testimony. When asked, "Were you familiar with steamboats or steamboating?" he says, "Nothing more than as a passenger ;" and when further asked, "You have lived at St. Albans, and have been more or less accustomed to going up and down to Charleston on boats?" he replied, "Yes, sir." Plaintiff was an attorney at law and justice of the peace, and at least a reasonably intelligent man, and it must be presumed that he had some knowledge of the regulations of the boat for the convenience and comfort of the passengers, as well as something about the duties of the deck hands on the boat. These things he must have known something about from the most casual observation in his experience as a passenger on such boats, and this presumption is sufficient to become an element of consideration by the jury in weighing the testimony submitted to them.

There is quite a conflict of testimony touching the actions of plaintiff involving the question of contributory negligence, as well as those of the employes on the boat, and as to the warnings of danger given plaintiff, etc. Even the testimony of the plaintiff himself is by no means free from conflict with itself. His theory is that the boat landed at the wharf, bow up-stream; that the stage plank ran from the wharf boat onto the bow of the steamboat above the steps which go up through the bulkhead to the upper deck. In answer to the forty-sixth question, plaintiff says, "The plank fell right at the foot of the steps, between myself and the steps," and that the plank struck his right foot some three or four feet from the end of the plank. This statement is in harmony with his theory of the position of the boat; but in answer to question 111 plaintiff says: "The plank was thrown. I was between the plank and the steps." Question 112: "Kind of facing the steps?" Answer: "I said my left side was rather facing to the steps. The plank came angling this way. That put me between the plank and the steps." Question 113, by the Court: "You mean that the plank was between you and the steps?" Answer: "I was between the steps and the plank when it was thrown." Question 114: "Was the plank between you and the bulkhead?" An-

swer: "No, sir." Question 115: "You were between the plank and the bulkhead?" Answer: "Yes, sir." And then afterwards again says that the plank was below him and between him and the steps. Wiley Hath, a witness for the plaintiff, says the boat backed down to the wharf boat; so that the inference is, her bow must have been upstream, while he ·does not say· so. Yet he says the plank fell on the right side of Webb; that Webb was between the plank and the steps; that he was making for the steps, and the plank fell nearer the head of the boat than Webb was, and on the outside of him and to his right. If ·this be true, the bow of the boat must have been downstream. In speaking of the passengers coming onto the boat, witness Hath first says Mr. Webb came on first. Then, in answer to the question, "Was anybody behind him or anybody before him, that you know?" he says: "Mr. Webb came right in front of Mr. Dr. Holland. Major Holland was right behind him. There was another fellow in front of Mr. Webb. I do not know who he was. They all came in together;" and says again: "The crowd was in front of him [Webb], but nobody got on the boat after he did. He and Mr. Holland was the last one to come on the boat." Wesley Fields, another witness for plaintiff, who says that he was one of the men who let the plank fall on the plaintiff's foot, says that the boat was lying with head up stream; that some eight or ten people came on the boat; that Webb was among the first to come on; and, being asked, "Where were the other passengers that came on at the same time?" answered, "They were going on up the steps;" that Webb stepped off the stage plank next to the steps; they dropped the plank next to the steps; Webb was between the plank and the steps; saw the plank bounce on his foot; that there was no vacant space on the front end of the boat where the plank could have been thrown "unless you had laid it upon the oil barrels." For the plank to have been thrown on the right of Mr. Webb when he occcupied his position between the plank and the steps leading to the upper deck, the boat must have necessarily been lying with her bow down stream. Mr. Webb was a passenger and the carrier owed him a higher duty in the way of protection from damages and injury than if he had been a stranger or mere trespasser. Whether, if his rela-

tion to the defendant had been that of a trespasser only, the instructions 5, 6, 7, 8, and 9 would be proper under the testimony submitted in the case, it is not necessary to consider here.

In view of the fact that the court gave to the jury, on behalf of the defendant, two other instructions, Nos. 3 and 4, as follows: "(3) The court instructs the jury that the mere fact that this accident happened on the boat of the defendant does not raise the presumption that such accident was occasioned through the negligence of the defendant, but, in order to warrant them in finding a verdict for the plaintiff, they must find from the evidence that said accident was caused by the negligence of the defendant, and the burden of proof is on the plaintiff to prove such negligence; and, even if they believe from the evidence that defendant's employes were negligent in drawing in the stage plank, by which the plaintiff was injured, still the plaintiff cannot recover if the jury believe that he was guilty of negligence which in any degree contributed to the happening of the accident. (4) The court instructs the jury that, even if they believe from the evidence that the employes of the defendant did not exercise due and proper care in taking in the stage plank, yet if they further believe that the plaintiff at the time failed to exercise such care and prudence as an ordinarily prudent man would exercise under similar circumstances, and that such failure on his part contributed in any degree to the happening of the accident and injury complained of as a proximate cause thereof, then he cannot recover in this action,"— which instructions fully protect the interests of the defendant in the premises, and go as far on the question of contributory negligence as the court could properly go under the evidence in the case,—I am of opinion that the instructions 5, 6, 7, 8, and 9 were properly refused.

Sixth. That "the court erred in refusing to arrest the judgment and grant a new trial (a) because said verdict was contrary to the law and the evidence; (b) because the court had misinstructed the jury, and refused proper instructions asked for by the defendant; (c) because of improper conduct of the juror Pauley and of the plaintiff and some of his witnesses, as shown by the affidavits filed by defendant in support of said motion." It is earnestly con-

tended by plaintiff that upon the whole evidence the verdict is sustained by a decided preponderance of evidence, and that "the court will not set aside the verdict on the ground that improper instructions were given, or proper instructions refused, not interfering with or affecting the preponderance of evidence, as such error would be deemed harmless; and that if, upon the whole evidence, the judgment is plainly right, it will not be reversed for errors of law which, if not committed, would not have produced a different result." As in *Bank* v. *Napier*, 41 .W. Va. 481 (23 S. E. 800); also *Plute* v. *Durst*, 42 W. Va. 63 (24 S. E. 580), and *Cunningham* v. *Bucky*, 42 W. Va. 671 (26 S. E. 442). Taking the whole evidence together in the case at bar, it is not such that, if the jury had returned a verdict for the defendant, it must have been set aside as contrary to the evidence, and as plainly wrong. There is evidence to support a verdict either for the plaintiff or defendant, and the preponderance is not decided the one way or the other, and it is eminently a case for the most careful consideration of the jury, and for the jury alone.

In support of its motion to set aside the verdict and grant a new trial, defendant filed the affidavits of L. A. Carr, president of the defendant company, J. M. Thomas, and E. A. Rogers, alleging improper conduct on the part of Calvary Pauley, one of the jurors who tried the case; that he had had conversations about the case with one John Holland, a witness for plaintiff, at the house and table of J. M. Thomas, where they boarded during the trial. Juror Pauley wholly denies such misconduct on his part; says that he had no conversation touching the case, but only heard a remark made by Wilt Allen to E. A. Rogers about the case, when "Rogers started to say something, and seemed to recollect himself, and simply remarked that he would not say what he had intended to;" that juror "thought the remark improper, but, as that was the only. reference to the case in any way, and the conversation stopped there, he said nothing, thinking it the proper course to keep out of and free from all such conversations." The statements made in all defendant's affidavits are denied and contradicted. The affidavit of Thomas states that the juror Pauley and John Holland, a witness for plaintiff, boarded at his house; that during the trial and before the

verdict he (Thomas) heard said Holland and Pauley talking about the case at the table, and affiant heard Holland say that Carr (meaning the Big Kanawha & Ohio River Packet Company) was rich, and should pay Webb, the plaintiff, ten thousand dollars for his injuries. Pauley, in his affidavit, denies emphatically having any conversation whatever with Holland concerning the case on trial, and has no recollection of having any conversation with him on any subject, and that he had no acquaintance with Holland, and only knew him by hearing his name called by others; and further stating that he heard no such remark as Carr being rich, and ought to pay Webb ten thousand dollars for his injury, made by Holland or any one else. Holland also by affidavit denies any such conversation. Thomas states in his affidavit that on Wednesday during the trial he was met by plaintiff, Webb, on the street, and asked by Webb if he knew how the juror Pauley stood,—what his feelings were in the case. Affiant replied that from what he had heard Pauley say in talking of the matter he thought the juror Pauley was in favor of him (Webb), and that said Webb then and there asked affiant to see the juror Pauley, and try and get him to give a verdict in his favor; but that affiant did not do so. This Webb, in his affidavit, denies, while he admits having met Thomas on the street, but claims that Thomas asked him about the case, and what he thought of the outcome. Webb replied he could not tell, and had no means of knowing. That Thomas said public sentiment was that plaintiff deserved a heavy verdict, and he hoped plaintiff would get a verdict for all he had sued for; then told Webb, without being solicited to do so, that Pauley, one of the jurors, would be for him; that he thought so from what he had heard him say. Webb asked what he had heard him say. His reply was that he could not remember it all; that he had tried to get the juror Pauley to say something definite, but had failed. That Webb then reminded Thomas that it was improper for him to talk to a juror, and cautioned him not to talk to Pauley about the case.

W. J. McNealey, a witness summoned for plaintiff, also made affidavit that he boarded during the trial at the house of J. M. Thomas; that he and Holland sat together

at the same table, and ate their meals at the same time during the whole time they were tending the said trial, and slept in the same room; that he is positive that at no time at the table at said Thomas' or any other place did he hear said Holland say that Carr was rich, and should pay Webb, the plaintiff, ten thousand dollars for his injury, or anything to that effect; and is positive that said Holland did not discuss the said case within his hearing while the juror Pauley was present, or he would remember it, knowing the said Pauley was a juror, and, knowing it to be improper conduct in any person to do such a thing. In his affidavit Carr says that he learned of such misconduct after the verdict of the jury, but fails to show affirmatively that his counsel was ignorant of such misconduct during the trial, and only by inference that he was himself ignorant of it. In *Flesher* v. *Hale*, 22 W. Va. 50, JUDGE SNYDER says: "When a party moves for a new trial on the ground of misconduct on the part of the jury, which took place during the trial, he must aver in his motion, and show affirmatively, that both he and his counsel were ignorant, until after the jury had retired, of the fact of such misconduct." Thomp. & M. Jur. §§ 428, 456, and cases cited. The appellant failed to bring itself within this rule, which is a very reasonable one. Affiant Carr, for and on behalf of defendant, says "that he learned the above matters [the matters stated in his affidavit] since the verdict of the jury," only speaking for himself, and does not even negative the fact that he might have known something of what was going on before, and does not "show affirmatively that both he and his counsel were ignorant of the fact of such misconduct until after the jury had retired." "The knowledge of the attorney in such case is the knowledge of the client." *Flesher* v. *Hale*, above referred to (page 49 and cases there cited). On the same page (49) JUDGE SNYDER says: "This rule proceeds upon the ground that a party ought not to be permitted, after discovering an act of misconduct which would entitle him to claim a new trial, to remain silent, and take his chances of a favorable verdict, and afterwards, if the verdict is against him, bring it forward as a ground for a new trial. A party cannot be permitted to lie by after having knowledge of a defect of this character, and speculate on

the result, and complain only when the verdict becomes unsatisfactory to him." *Selleck* v. *Turnpike Co.*, 13 Conn. 453; *Orrok* v. *Insurance Co.*, 21 Pick. 456; 8 Barn. & C. 417.

For the reasons hereinbefore stated, I am of the opinion that the court erred in overruling the motion to set aside the verdict and grant a new trial. Therefore the judgment rendered in this case on the 2d day of April, 1896, is reversed, the verdict set aside, and the case remanded for a new trial to be had therein.

BRANNON, JUDGE (*concurring*):

I agree to reverse the judgment. I desire to say, however, that I do not deem the evidence elicited under question 9 to plaintiff, and held error in the foregoing opinion, as sufficiently material for reversal. I do not regard plaintiff's instructions Nos. 4, 5, and 6 improper. They are not abstract. There was evidence enough, surely, pertinent to their hypotheses, to save them from that impeachment. Nor were they what we may call partial instructions; that is, specifying certain facts as supposed to be proven, and telling the jury that, if proven, the verdict must go for the plaintiff, ignoring other facts in the case. Though the case involved contributory negligence, that did not render these instructions improper, because the plaintiff had the right to deny the presence of contributory negligence, and to have the court lay down what would be the obligation of a common carrier, if the jury should think no contributory negligence was shown. And I think there was error against defendant in refusing defendant's instructions. The giving of certain instructions covering contributory negligence in a general sense would not exclude these, as a party has a right to specify certain facts as controlling the case, if they are proven, so they are all the material facts,—the controlling facts,—thus asking the jury to say whether those facts do exist, calling their attention to specific facts, and saying that, if they exist, they call for a verdict for him.

*Reversed.*