# CHARLESTON

## DELMAR OIL CO *v.* BARTLETT.

Submitted June 10, 1907.    Decided November 26, 1907.

1,   CONTRACT—*Performance—Question for Jury.*

In an action to recover the price per foot for drilling, under a contract providing that an oil well should be drilled to a certain depth unless oil be found at a less depth in quantities satisfactory to the oil company, whether such well was drilled to a proper depth, in accordance with said contract and proper skill and workmanship, is a question of fact for the jury. (p. 706.)

2.   SAME.

If one party to a contract is compelled to abandon it because of the other's negligence or improper interference, he is excused from further performance and may sue for the part performed.   (p. 706.)

3.   SAME — *Question for Jury.*

Whether there has been such negligence or improper interference is also a question of fact for the jury.   (p. 706.)

4.   EVIDENCE—*Opinion Evidence.*

The opinion of a person skilled and of long experience in drilling oil wells and taking fastened tools therefrom is admissible as to the effect of running into a well 3356 feet deep a bit dressed in a particular way, upon a large piece of iron left at the bottom of said well, and as to the effect of such a piece of metal upon the tools themselves.   (p. 707.)

5.   TRIAL—*Rejection of Evidence.*

Refusal of the court to permit a witness to answer a question which by its own terms and subject matter, taken in connection with facts and circumstances already in evidence, shows its relevancy and materiality, is not available as prejudicial error on a motion for a new trial, if the expected answer of the witness was not disclosed to the court at the time of the ruling.   An appellate court, in reviewing a judgment on writ of error, can not assume, in such case, that an answer favorable to the exceptor would have been given.   (p. 708.)

6.   APPEAL—*Review—Rejection of Evidence.*

The party complaining in the appellate court of the rejection of evidence by the court below must state the facts and evidence in the bill of exceptions, from which, to cause reversal, it must affirmatively appear to the appellate court that he was prejudiced. (p. 708.)

7. TRIAL—*Instructions.*

When there is conflict of testimony, and evidence on one side supporting one theory and evidence on the other side supporting another and conflicting theory, and the principles of law applicable to each theory are different, it is error for the court to give as instruction to the jury abstract propositions of law applicable to only one of said theories, without reference in such instructions to the evidence in the case. (p. 708.)

8. SAME.

An instruction which undertakes to cover the whole case and to state all the circumstances and conditions to be considered by the jury in arriving at a verdict, but which omits an essential view of the case, is erroneous. (p. 709.)

9. SAME.

While a party is entitled to have his view of the evidence stated hypothetically in an instruction, he has no right to call special attention to a part only of the evidence and the facts it tends to prove, to the exclusion of the other evidence in the case. (p. 709.)

10. SAME.

The court ought not to give an instruction irrelevant to the case, although as an abstract proposition of law it may be correct. (p. 710.)


Error to Circuit Court, Marion County.

Action by the Delmar Oil Company against F. W. Bartlett. Judgment for defendant, and plaintiff brings error.

*Affirmed.*

W. M. HESS and U. N. ARNETT, JR., for plaintiff in error.

W. B. CORNWELL, for defendant in error.

MILLER, PRESIDENT:

In its action of *assumpsit* on the common counts, the plaintiff's bill of particulars charged the defendant with certain oil well supplies and certain gas furnished for drilling, aggregating $486.25. The defendant, besides the general issue pleaded, filed his bill of sets-off, aggregating $7,861.-40, the principal item of which was, as assignee of John W. Pool, "To drilling Talkington well No. 4, * * 3356 ft. @ $1.20 per ft., $4,027.20;" all other items being in his own right, for certain oil well supplies and use of others.

There was a verdict and judgment in favor of the defendant for $4,027.20, the exact amount of the above item in his bill of sets-off.

As precluding consideration of every other question, counsel interposes the objection that the blank form of contract upon which the rights of the parties depend is not sufficiently identified to make it a part of the evidence certified; but reference to the original transcript of the record and the original bill of exceptions, together with the description or the paper by witnesses, satisfies us that it is so marked and identified as to leave no doubt that it is the document referred to in the bill of exceptions, and it will be considered as a part of the record. See *DeBoard* v. *Railway Co.* and *Chadister* v. *Railroad Co.*, recently decided by this Court and not yet reported.

Pool, a driller and contractor of long experience, had drilled a number of wells for the plaintiff. There had been no written contract executed for the drilling of the Talkington well; but it is conceded that it was drilled upon substantially the same terms as contained in the printed contract under which Pool had drilled the former wells, the blanks therein being supplied by oral agreement to suit this particular well. This printed form of contract, with the verbal terms supplied in reference to the Talkington well, provided, among other things, that the drilling should be prosecuted diligently until completion, without interruption except from unavoidable causes; that said well should be drilled 2500 feet below the Pittsburg coal, unless oil or gas be found at a less depth in quantities satisfactory to the company, and, when drilled to the depth required, should be thoroughly cleaned; that, after the oil or gas bearing sand was reached, the "method of drilling" should be under the direction of the company; that an oil saver and steel measuring line should be furnished by the company; that Pool should keep such a record of the strata passed through in drilling as required by the company; that when the well was completed and delivered, clear of all obstructions and free of all claims for work done or materials furnished, Pool should receive $1.20 per foot for the drilling thereof.

The well was drilled to a depth of 3356 feet in all. Oil was struck at the depth of 3346 feet "in quantities satisfactory" to the company. When this occurred the well was measured by Backon, assistant superintendent of the company. Pool claims that Reardon, superintendent, then directed him to drill ten feet deeper but not through the sand; but Reardon contends he directed him to drill fifteen feet deeper. Pool, corroborated by his tool dresser, testifies that at the depth of 3356 feet the bottom of the sand was reached, as evidenced by its appearance, and that it was dangerous to go farther for fear of breaking through and destroying the well; that the driller began to clean out the well, and Pool notified Reardon to come and measure the hole, that it was deep enough. Reardon, in the absence of Pool, went to the well, and, with the help of the driller and tool dresser employed by Pool, using the steel measuring line provided by his company, and what is called in the record a two-inch stop cock core as a weight for a sinker, ran the line down in the well, ascertaining the depth to be as stated. All parties agreed that this core was a dangerous thing to use in the well. It was the same instrument used by Backon in the previous measurement, after he had lost in the well a piece of pipe used for that purpose. Pool claims, but Reardon denies, that he told Reardon, after learning it had been used by Backon, it was an improper tool to run in the well, and that Reardon replied, "Some people you can't learn anything." Reardon says that when he made the measurement he was furnished this core by the driller and tool dresser; that he objected to it, saying he did not like the looks of it, that it did not look heavy enough and that he would rather have a pipe weight; that the driller said, "We run that weight; it is a good weight;" that he replied, "All right; if you can run it I can;" and so he ran it down. Reardon and the tool dresser were the only witnesses examined as to what took place at the well after the measurement. The tool dresser testified that Reardon was present giving directions when he and the driller proceeded to pull out the measuring line; that in the act of doing so the line was broken, leaving eight hundred feet of it and the piece of iron still in the well; that Reardon then gave directions to run the bailer and fish out the rest

of the line; that they did so, and succeeded in getting out the rest of the line but were unable to get the weight; that Reardon then gave direction to the driller and him, in the absence of Pool, to run another bit, knowing the iron was still in the hole, which they proceeded to do, using a newly sharpened bit, dressed half an inch less than the size of the hole to avoid sticking the tools, with the result that the tools became fastened. Reardon claims he was not present when the driller and tool dresser began to pull out the line, but was a short distance away aiding with the steam line; but he admits that, in the absence of Pool, he directed them to run another bit, claiming the well was not deep enough. Pool says that Reardon came to him shortly afterward, at another well on a nearby farm, and said he had measured the well but had broken the line and left a part of it in the hole. Reardon says what he then told Pool was that the driller and tool dresser had broken the measuring line and left eight hundred feet of it in the hole. He, however, testifies in the same connection: "I said that we had gotten all of the line but the weight was left in, and that he had better go up and see about it." Pool further says, although contradicted by Reardon, that about noon of the same day, at the boarding house, the driller told him, in the presence of Reardon, that the tools were stuck, assigning as the cause the presence in the well of the stop cock core used in measuring; that he then asked Reardon if he had used that core as a weight, and he replied that he had. After a prolonged effort to fish out the tools, Pool gave it up and demanded his pay, notifying the oil company that he regarded the well completed. Subsequent negotiations between the company and the defendant Bartlett, to whom Pool had meanwhile assigned his claim for drilling the well, resulted in the assignee making an unsuccessful attempt to fish out the tools. The company nevertheless tubed the well, which continued to flow oil for some time, starting at seventy-five barrels per day, and continued to produce oil for something over a year, when it became flooded with water.

Counsel argue that it was not the duty of the company under the contract to measure this well; and that Backon and Reardon, having been requested by Pool to measure it, acted, in doing so, as his servants, he and not the com-

pany being responsible for any negligence on their part. But we do not think these rules, governing the relation of independent contractor and his servants in respect to injuries sustained by innocent third persons, are applicable here, where the parties are in privity of contract and negligent interference by the plaintiff is claimed, especially in view of the clause in the contract reserving to the company the right to control the drilling through the oil bearing sand.

The case was tried and is presented here, by each party, upon two theories. On the part of the defendant they are: (1) that the well was completed under the contract at the time Pool notified Reardon that it was deep enough and asked him to measure it; (2) that, even if the drilling through the oil-bearing sand was not at the risk of the company under the provision of the contract that the same should be under its direction, nevertheless, conceding it was not completed at the time of the last measurement, the negligent use and loss in the well by Reardon of the stop cock core, resulting in the sticking of the tools, and the direction by Reardon to the driller and tool dresser to run another bit, while this dangerous piece of iron was still in the well, were such an interference by the company as will excuse non-performance. The theories of the plaintiff are: (1) that Pool had not completed the contract at the time of the last measurement; (2) that, whether the loss of the weight in the hole was due to negligence of the employees of Pool, of Reardon acting for Pool, or of both, resulting in the sticking of the tools, Pool and not the company must bear the loss.

The construction placed upon the contract by the company is that it is the sole arbiter as to whether or when the same was completed. In our judgment, the contract does not make it so. According to the contract proven, the well was to be drilled 2500 feet below the Pittsburg coal unless oil should be found at a less depth in quantities satisfactory to the company. It clearly appears that oil had been found in satisfactory quantities; and the company had signified this fact, at the time of the measurement by Backon, by direction to Pool to drill ten or fifteen feet (as the fact may be) deeper but not through the sand. Whether the

well had been drilled to a proper depth, in accordance with the contract and proper skill and workmanship, was a question of fact for the jury. But, even if the jury determined this question in favor of the company, the important question would still remain whether, in the further effort of Pool to complete the contract, the company, without his consent or acquiescence, negligently interfered with or interrupted performance thereof, so as to excuse him and entitle his assignee to demand the contract price for part performance; for it is well settled that, if one party to a contract is compelled to abandon it because of the other's negligence or improper interference, he is excused from further performance, and may sue for the price of the part performed. *Clark* v. *Franklin,* 7 Leigh 1; *Kern* v. *Zeigler,* 13 W. Va. 716; *Lynch* v. *Sellers,* 5 L. R. A. 682; *Chicago* v. *Tilley,* 103 U. S. 154; *Little* v. *Mercer,* 9 Mo. 133; 9 Cyc. 639. And whether or not there was such negligence or improper interference on the part of the company or its agents was also a question of fact for the jury.

The errors argued here relate to the refusal to set aside the verdict and grant a new trial; the giving of the two instructions for the defendant; the refusal of the seven instructions asked for by the plaintiff; and the refusal to admit the expert testimony of G. A. Schaffner.

First, as to the rejected testimony of Schaffner. This witness, who had been brought from Pennsylvania for that purpose, had fully qualified himself to speak as an expert with reference to drilling oil wells and fishing out tools. Pool had already testified as follows on behalf of the defendant: "Q. From your experience in drilling wells, what would be the probable effect on a string of tools or a bit in running it into the well or hole where a piece of iron of the character you have described (6 1-2 inches long, 2 1-2 inches in diameter at one end and 2 3-4 at the other) was? A. It would be a dangerous tool for a string of tools to run on. The probabilities are that the stop cock core formed a wedge to stick the tools in the bottom of the hole." Schaffner, when afterwards called as a witness for plaintiff, was asked: "Suppose a two inch stop cock core, similar to the one in evidence, in measuring the well had dropped to the bottom of the well, 3356 feet deep, and that the tools with

a fresh bit were run down on that stop cock core, the diameter of the hole · being 6 5-8 inches; I will ask you to state whether or not that would be sufficient to form a wedge and stick the tools so that they could not be removed." Objection to this question was sustained. Was this error? We think it was, especially in view of the above evidence of Pool admitted. We are told by counsel that this ruling was based on *Overby* v. *Railway Co.*, 37 W. Va., 524, holding that "if the facts in a case can be placed before the jury, and they are of such a nature that jurors generally are just as competent to form an opinion in reference to them and draw inferences from them as witnesses, then the opinions of experts can not be received in evidence as to such facts. * * * The opinion of, a witness who neither knows nor can know more about the subject matter than the jury, and who must draw his own deductions from the facts already in the possession of the jury, is not admissible." This law, if applicable to the testimony of Schaffner, would also have excluded the evidence of Pool referred to; but we do not think it covers this case. How a bit of the size and dimensions given, dressed "shy," attached to stem and jars, and run into a hole of the depth and other dimensions given, would act upon the stop cock core at the bottom of the well; what would be the effect of such a piece of metal upon the tools themselves; and what would otherwise be the effect of running a bit, freshly dressed as this one was, into a hole of the character described—were questions of such a nature that jurors generally would not be as competent to give judgment upon them as would persons of long experience in drilling oil wells and fishing out tools. The rule applicable here we think is that of *Welch* v. *Insurance Co.*, 23 W. Va. 305, in which Judge Green says: "Of facts which require proof by means of indirect evidence, says Starkie, there are some of so peculiar a nature that juries can not without other aid come to a direct conclusion on the subject. In such instances, where the inferences require the judgment of persons of peculiar skill and knowledge on the particular subject, the testimony of such as to' their opinion and judgment upon the facts, is admissible' evidence to enable the jury to come to a correct conclusion." The rule admitting such testimony has been held to include the opinion of

persons skilled in handling derricks as to the sufficiency in strength of the ropes used in connection therewith—*Stone Co.* v. *Williams*, 57 N. E. 558; of a person skilled in shooting wells with glycerine—*Torpedo Co.* v. *Fishburn*, 61 Ohio St. 608; of persons experienced in handling certain machinery connected with elevators—*Slack* v. *Harris*, 200 Ill. 96.

But can we say from the record that the plaintiff has been prejudiced by the ruling complained of? The question propounded to Schaffner was likely intended to elicit an answer contradictory to the evidence of Pool; but the answer may, for all we know or can see from the record, have corroborated him. The answer was not taken; nor does the record show what the plaintiff expected or intended to prove by the witness; and therefore we can not say that the question itself imports an answer probative of facts material to the plaintiff's interest, so as to render the action of the court ground for reversal. *Nease* v. *Capehart*, 15 W. Va. 299; *Jackson* v. *Hough*, 38 W. Va. 236; *Kay* v. *Railroad Co*,, 47 W. Va. 467; *Scotland Co.* v. *Hill*, 112 U. S. 183; *Shinnston* v. *Proprietors*, 12 L. R. A. 554; *State* v. *Clifford*, 59 W. Va. 1. In the latter case, it is said: "Refusal of the court to permit a witness to answer a question which by its own terms and subject matter, taken in connection with facts and circumstances already in evidence, shows its relevancy and materiality, is not available as error on a motion for a new trial, if the expected answer of the witness was not disclosed to the court at the time of the ruling. An appellate court, in reviewing a judgment on writ of error, can not assume, in such case, that an answer favorable to the exceptor would have been given." The party complaining in the appellate court of the rejection of evidence by the court below must state the facts or evidence in the bill of exceptions, from which it must appear affirmatively to the appellate court that he was prejudiced. *Taylor* v. *Boughner*, 16 W. Va. 327; *Jackson* v. *Hough* and *State* v. *Clifford*, *supra*. Without prejudicial error thus made to appear, we cannot reverse the judgment on this ground.

What shall we say in reference to the instructions of the plaintiff refused? A statement of the general rules applicable will more readily enable us to dispose of the questions

involving these instructions. We have already outlined the theories upon which the case was tried; and there was conflicting evidence tending to support each of the theories. '' When there is conflict of testimony, and evidence on one side supporting one theory, and evidence on the other side supporting another and conflicting theory, and the principles of law applicable to each theory are different, it is error for the court to give as instructions to the jury abstract propositions of law which are applicable to only one of said theories, without any reference in such instructions to the evidence in the case.'' *Webb* v. *Packet Co.*, 43 W. Va. 800, a case where the instruction given ignored the defense of contributory negligence. An instruction which undertakes to cover the whole case and to state all the circumstances and conditions necessary to be considered by the jury in arriving at a verdict, but which omits an essential view of the case, is erroneous. *Railway Co.* v. *Mann*, 99 Va. 180; *Bowles* v. *Commonwealth*, 103 Va. 816. While a party is entitled to have his view of the evidence stated hypothetically in an instruction, he has no right to call special attention to a part only of the evidence and the facts it tends to prove, to the exclusion of other evidence in the case. *Thompson* v. *Douglass*, 35 W. Va. 344; *Woodell* v. *Improvement Co.*, 38 W. Va. 23. The court ought not to grant an instruction irrelevant to the case, though as an abstract proposition of law it may be correct. *State* v. *Thompson*, 21 W. Va. 741; Blashfield on Instruc., section 86. Measured by these rules, we do not think the court erred in refusing the several instructions asked for by the plaintiff. The first was long and involved, and contradictory in itself, tending to mislead the jury. It ignored the theory of the defendant that at the time of the last measurement Pool had already completed the well. It assumes as a fact that it was the duty of Pool under the contract to measure the well, which in our opinion is not a true construction of the agreement. His request to Reardon to measure the well was with the view of getting his pay at the price per foot, his claim being that he had completed his job. Moreover, this instruction, as did also instruction number 2, ignored the theory of the defendant that the dropping of the weight in the well by Reardon and those he engaged to assist him,

and his direction to the servants of Pool, without the knowledge or consent of the latter, to drill deeper, even assuming the well was not then completed, constituted an improper and negligent interference with the work, relieving Pool from further performance of the contract. Each of the other instructions asked for by the plaintiff ignored both the theory that the well had been completed when the measuring was done, and the theory of negligent interference by the plaintiff, and were properly refused.

As to the two instructions given on behalf of the defendant, the first presents the claim that the well was not completed at the time of the last measurement, the theory of the plaintiff, and then presents the claim of negligent interference, the theory of the defendant; and there was no error therein of which the plaintiff could complain. With respect to the second, if its assumption was that there was evidence tending in an appreciable degree to show that prior to the measurement by Reardon the plaintiff had exercised its right under the contract to direct the method of drilling through the sand, we do not think the evidence would support such an assumption. But, as we interpret the instruction, its purpose was simply to tell the jury that by the terms of the contract, when the well reached the sand, the plaintiff had the right to direct the method of drilling through the same; and, inasmuch as the conclusion of the instruction is confined to the time after the measurement by Reardon and the sticking of the tools due to his negligent interference, according to the theory of the defendant, we do not think there was error, in giving the instruction in the form stated, prejudicial to the rights of the plaintiff and calling for reversal.

It remains to consider the motion to set aside the verdict and grant a new trial. The ground therefor, not covered by the action of the court on instructions and the rejection of evidence, is that the verdict was contrary to the law and the evidence. As there was conflicting evidence on all the controverted facts, the matter was peculiarly within the province of the jury; and, as we can not perceive any rule of law has been contravened thereby, we are of opinion to affirm the judgment.

*Affirmed.*