# CHARLESTON.

## MYLIUS v. RAINE-ANDREW LUMBER CO.

Submitted March 4, 1910.     Decided May 9, 1911.

1. BOUNDARIES—*Establishment.*

In the trial of an action, involving title to land, dependent upon the location of boundary lines and application of the title papers to their subject matter, it is not error to instruct the jury to give controlling influence to lines and corners marked upon the ground and identified, in so far as the lines were actully surveyed, and to courses and distances, in those instances in which the lines were not actually surveyed nor marked upon the ground. (p. 359).

2. SAME—*Ascertainment.*

It appearing that a large tract of land was subdivided into a number of lots and a plat thereof made, in accordance with which deeds were executed, and which is referred to in the deeds for the description of the lots, and that the exterior lines were only partially surveyed and only a few of the interior lines actually run, and there is inconsistency between the plat and some of the lines so surveyed, the court may properly instruct the jury that, in locating any lot, it is to be governed and controlled by the plat, except in so far as it is in conflict with the lines actually run and marked upon the ground. (p. 359).

3. TRIAL—*Instructions.*

Instructions to a jury must be broad enough in their scope and effect to present all material phases of the issue to which they relate. By whomsoever prepared, they are the instructions of the court, and, if they obviously tend to mislead the jury by reason of their narrowness, though correct as to one or more phases of the case developed by the evidence, it is error to give them. (p. 364).

4. SAME.

On the trial of an issue as to which there is conflict in the evidence, the instructions, if any, must submit the conflicting theories the evidence tends to prove. Presentation of one of them and silence as to the other are tantamount to a comment on the weight of the evidence. (p. 364).

5. SAME—*Instructions—Misleading Instructions.*

Instructions confined to a subsidiary and inconclusive issue, founded upon the evidence, and ignoring the direct and vital issue, tend to mislead the jury and cannot properly be given. (p. 364).

6.  DEEDS—*Construction—Inconsistent Description.*

If a deed contain a general description of property, conforming to the manifest intention of'the parties, as shown by the situation and circumstances surrounding them and the purpose they had in view, and also another description, clearly inconsistent with such circumstances and purpose, and false in that it applies wholly or partially to property not owned by the grantor, nor intended to be conveyed by him, but already owned by the grantee and not intended to be purchased by him, such latter description must be rejected as false and as having been inserted in the deed by accident or mistake. (p. 361).

7.  SAME—*Construction—Question for Court.*

The construction of a deed, not dependent in any way upon extrinsic evidence, and also of a deed dependent upon extrinsic evidence, when the facts are undisputed, is a question for the court and not for the jury. (p. 361).

8.  BOUNDARIES—*Establishment—Burden of Proof—Claimant Under Inclusive Grant.*

The rule requiring a claimant under an inclusive grant, to show that the land in controversy lies without the boundaries of the land excepted from the grant, as having been previously surveyed, as well as within the boundaries of the grant, has no application, if the grant has been subsequently forfeited for nonentry for taxation and sold in a judicial proceeding, at the instance of a commissioner of forfeited and delinquent lands, as a whole, and without exception of any portion thereof, and it does not appear that the excepted lands were granted between the date of the inclusive grant and the date of the commissioner's deed. (p. 365).

9.  PUBLIC LANDS—*Illegal Sale of Waste and Unappropriated Lands —Statutes.*

By virtue of the provisions of section 19 of chapter 105 of the Code of 1906, a deed made, by a commissioner of forfeited and delinquent lands, under such judicial proceeding, constitutes a new grant by the state, passing to the grantee all right and title of the state to the land, whether held by reason of its never having been previously granted, or its subsequent acquisition by forfeiture or purchase. (p. 366).

10. SAME—*Illegal Sale of Waste and Unappropriated Lands—Statutory Provisions.*

Deeds made by commissioners of school lands, ineffectual to pass title to waste and unappropriated lands, for want of legislative authority to dispose of them in the manner in which forfeited lands were sold, are validated by section 19 of chapter 105 of the Code of 1906. (p. 366).

11. EVIDENCE—*Opinion Evidence—Subjects of Expert Evidence—Location of Boundary Line.*

The opinion of a surveyor as to the true location of a boundary line is inadmissible as evidence. (p. 368).

12. BOUNDARIES—*Ascertainments—Admissibility of Evidence.*

If, in an action involving title to land, admissions and conduct of one of the parties, relating to locations and boundary lines, are relied upon, it is not error to permit him to introduce an agreement with a third party, concerning the land, which tends to nullify the effect of such admissions and conduct. (p. 368).

Error to Circuit Court, Randolph County.

Action by Charles E. Mylius against the Raine-Andrew Lumber Company. Judgment for plaintiff, and defendant brings error.

*Reversed and Remanded.*

*Fred O. Blue, C. H. Scott,* and *Harding & Harding,* for plaintiff in error.

*W. B. Maxwell* and *D. H. Hill Arnold,* for defendant in error.

POFFENBARGER, JUDGE:

Charles E. Mylius recovered a judgment against The Raine-Andrew Lumber Company, a corporation, for $8,000.00, in an action of trespass *quare clausum fregit,* in the circuit court of Randolph county, which has been brought here for review on a writ of error.

The declaration charges the cutting and carrying away of a large amount of timber and the defense is want of title in the plaintiff to the land on which the timber grew. The question for determination, therefore, is as completely one of title as if this were an action of ejectment. A large tract of land, 19,000 acres, was granted by the Commonwealth of Virginia to Henry Phillips, September 22, 1795. Having become forfeited for non-entry for taxation, prior to the year 1840, it was sold, as forfeited land, under judicial proceedings regularly had, so .far as the record shows, but, before sale, it was divided, by the Commissioner of Forfeited and Delinquent Lands, into 23 lots, numbered from 1 to 23, respectively. In making this division, the commissioner actually ran some of the

lines, but others were not run, and some lots were entirely, and others partially, platted on paper, without actual survey, and all were sold according to the plat. L. D. Morrall became the purchaser of lots Nos. 11, 12, 14, 15, 22 and 23, containing respectively, 800, 1,000, 500, 800, 540, and 921 acres, and John Wyatt purchased, among others, Lot No. 13, and these sales were confirmed and deeds made, referring to the plat. Lots Nos. 11 and 15 passed to Baker Brothers by successive conveyances prior to 1879. E. D. Parren, prior to 1875, became the owner of lots Nos. 14 and 22. The title to these last two lots was forfeited and sold, under judicial proceedings, on March 27, 1876, one Isaac Baker becoming the purchaser of Lot No. 14, and T. J. Arnold of 348 acres, part of Lot No. 22, adjoining Lot No. 14. The Bakers having become owners of lots Nos. 11, 14 and 15 prior to August, 1879, conveyed the same to Charles E. Mylius and others. Afterwards, Kupfer and Farnsworth became interested in these lands. Mylius, by a partition deed dated March 1, 1891, conveyed to Kupfer 743 acres out of the northern ends of lots Nos. 14 and 15, the southern line of this conveyance extending east and west across the same, he having previously conveyed to Kupfer an undivided one-fourth of lots Nos. 11, 14, 15 and 20. He, Farnsworth and Mylius, by deed dated June 1, 1893, partitioned the same and Farnsworth thereby became sole owner of 495 acres, cut off of the southern end of Lot No. 11, and Mylius and Kupfer owners of the residue of Lot No. 11 and the whole of lots Nos. 14 and 15. In connection with the conveyance from Mylius to Kupfer, a plat was made, known as the "Sherwood Plat", which was referred to in the deed and also in the partition deed above mentioned. The western part of Lot No. 13, adjoining Lot No. 14, became the property of the defendant, The Raine-Andrew Lumber Company, by a deed from Jennings Brothers, dated May 22, 1901, they having obtained it by deed from Jacob Carr and others, dated June 26, 1900. Kupfer conveyed to the defendant all the 743 acres except a small parcel thereof at the northwest corner, by deed dated April 27, 1901, and Mylius conveyed to it 160 acres, adjoining the Kupfer land and also the Jennings-Carr lands, by deeds dated Oct. 29, 1901. This land came out of lots Nos. 14 and 15, and probably No. 11, as shown by the Goff

plat, and lies on the east side of what is called Glady Fork. The defendant cut and removed timber from a part of Lot No. 14, which, it is charged, was not included in any conveyance to it.

The plaintiff brought two actions, one on the 27th day of May, 1903, in which he laid his damages at $3,000.00, and the other on the 24th day of June, 1905, in which he laid the damages at $10,000.00. As these two actions involve the same timber, and the second covered the subject matter of the first, they were consolidated and tried as one, and the controversy is, whether the timber cut was within the boundaries of the lands retained by Mylius, and this turns partly upon a dispute as to the location of Lot No. 14, all the timber in controversy having been taken from 172.5 acres of land, lying within its boundaries as platted by Goff, Commissioner, and partly upon the location of the land conveyed to the defendant by Jennings Bros. and Mylius, respectively. The corner called for in the deeds made by David Goff, who made or caused the original plat to be made, according to which they were executed, designated as the common corner of lots Nos. 11, 12, 14 and 15, a maple. While no maple is found on the ground, the defendant claims the one referred to in the plat and deeds stood at a point near the middle of Lot No. 11, as it is located by the courses and distances specified in the Goff plat, and there is evidence tending to sustain this contention. Insisting upon this as the true location of the common corner, it claims the entire plat must be shifted south about 162 poles and west about 100 poles. This would practically draw Lot No. 14 away from the territory in dispute and deny title in Mylius to the timber in controversy.

In general form, the tract of land, though irregular, is rectangular, its greatest length being north and south, and the division lines run nearly north and south and east and west. As we have said, Commissioner Goff did not actually survey all of the lines, neither the exterior nor the interior. According to his report, he commenced at the well defined and admitted southeastern corner and ran to the southwestern corner, and then ran up the irregular western line, calling for a chestnut, beech and maple on top of Shaver's Mountain, corner to lots Nos. 4 and 8, a hemlock and spruce pine, corner

to lots Nos. 8 and 9, and two hemlocks and a beech, corner
to lots Nos. 9 and 17. Here he stopped, after having run some-
thing more than half of that. His next surveying was of interior
lines and will be stated later. After running them, he went
back to the beginning point and ran the eastern line a dis-
tance of 500 poles to two small beeches and stopped on that
line. Afterwards, he ran some more interior lines from that
point. His first running of inner lines was as follows: Com-
mencing at two hemlocks and beech in the western line, he ran
easterly 320 poles to a hemlock, and then 320 poles to two hem-
locks and a service and then 320 poles to a maple, corner to
lots Nos. 11, 12, 14, and 15. Though he does not say, in his
report of survey, that the hemlock and the two hemlocks and
service are corners, he had indicated on his plat a hemlock as
the corner of lots Nos. 9, 10, 16 and 17, and two hemlocks
and a service as the corner of lots Nos. 10, 11, 15 and 16.
From the maple, he turned south and ran 400 poles to a spruce
pine, (corner of lots Nos. 6, 7, 11 and 12 according to the
plat, but not so designated in the report), thence west to two
beeches and a lynn on the north bank of Big Run, (corner to
lots Nos. 7, 8, 10 and 11, on the plat but not so designated in
the report), thence south again to eight beeches, two sugars
and an ash, corner to lots Nos. 4, 5, 7 and 8 and stopped.
On the other side, after having run north 500 poles on the
eastern line, he turned into the body of the tract and ran
320 poles to two beeches and a maple, a corner to lots Nos.
1 and 2. Then he turned south and ran 485 poles, the
division line between lots Nos. 1 and 2, to the exterior southern
line, where he made a corner indicated by two beeches. This
is all the surveying he did on the whole boundary. Commenc-
ing at the western outer line, he actually ran the northern
boundaries of lots Nos. 9, 10 and 11, the southern boundaries
of lots Nos. 15, 16 and 17, the eastern and southern boundaries
of Lot No. 11, the western line of Lot No. 12, the western
boundary of Lot No. 7, and the eastern boundary of Lot No. 8.
On the other side, he ran all the lines of Lot No. 1 and the
eastern and southern lines of Lot No. 2. He ran none of the
lines of Lot No. 14. His report calls for nothing affecting
Lot No. 14 but the maple corner. Every line thereof
shown on the plat stands unaffected by any actual surveying

done, except in so far as they may be influenced, if at all, by the location of the maple as a corner.

The evidence seems to leave no doubt that the Goff plat is founded upon the boundaries of the original grant, and radically conflicts with some of Goff's actual surveying. The southern line, southeastern corner, eastern line, northeastern corner and a western corner of the original grant are admitted. and there is evidence strongly tending to establish them. The beginning corner of the old grant was a large maple, north of a road, and there seems to be no controversy about its location. Goff began his survey at a "Maple Stump in John Wiatt's garden." The old grant then calls for a course N. 76 W: and a chestnut and cucumber corner, 782 poles distant. Goff's plat calls for the same course and corner and deviates from the distance to the extent of 18 poles, making it 800. At the northwestern corner, the old grant and Goff's plat call for the same timber, a large sugar tree and ash, and for substantially the same courses and distances. The courses and distances lead to the same northeastern corner also, and a very ancient corner is found there. But Goff's surveying on the western side, covering more than half the length of the western line, is about 100 poles outside of the grant, as shown by his plat. This circumstance and the location of the line, run partially through the tract by Goff from the two hemlocks and beech on the western side, give birth to a number of contentions and important questions cluster around them. In tracing this old line, timber was found, indicating that it had been run, not between lots Nos. 9, 10 and 11, on the south, and 15, 16 and 17, on the north, as indicated by the plat, but, on the contrary, right up through lots Nos. 9, 10 and 11, as located by the plat. Moreover, the maple called for at the eastern end thereof, instead of being at the corner of lots Nos. 11, 12, 14 and 15, as laid down on the plat, is actually closer to the center of Lot No. 11, as shown by the plat, than to any of its corners or lines. This line is farther south than the plat line, according to this evidence, by about 162 poles, and its *termini* farther west than the plat indicates by about 100 poles. The evidence, indicating the actual running of this line through lots Nos. 9, 10 and 11, as they are located on the plat, instead of immediately north of them, is so strong that the

plaintiff, in his testimony, admits it, but he claims the plat
was made without reference to this line, or that the platting
of the whole tract was correctly done as to all except the lots
bordering upon this line, and that the mistake, whether in the
plat or in the survey, cannot affect the location of any other lots.
There seems to be little or no evidence tending to show that
the platted line from west to east, from the two hemlocks to
the maple, was ever run upon the ground. In addition to the
testimony, relating to this uncertain line, or discrepancy be-
tween the plat and Goff's actual surveying, and the exterior
lines, there is much more concerning the location of other
lots and some conflicting grants, not affecting Lot No. 14, but
its bearing upon the real issue is not so direct as that of the
evidence above referred to. For this reason, time and space
will not be consumed in setting it forth here.

But there is a mass of evidence in the case, bearing upon
another phase of the issue. It is contended that, even though
Lot No. 14, as sold and conveyed by Goff, should be located
by the plat and the inconsistent actual surveying and location
of Lot No. 11 and others may not preclude the location of
Lot No. 14, as it is laid down upon the plat, Mylius never
obtained title to the lot as so located. Goff conveyed lots Nos.
14 and 22 to Granville E. Jarvis. Jarvis conveyed these lots
to E. D. Parren, in whose name they became delinquent for
nonpayment of taxes and were sold by the State. George W.
Yocum, commissioner of school lands, instituted proceedings
in the circuit court of Randolph county in 1875, under which
they were sold to Isaac Baker. In this proceeding, Nicholas
Marstiller, surveyor of Randolph county, made a report, pur-
porting an actual survey of these lots and they were conveyed
according to the description set forth in his plat and report.
The boundaries as set forth in this deed under which Mylius
claims, and the only one purporting to confer title upon him
to said Lot No. 14, are said to be in accord with the location
thereof as claimed by the defendant. The description calls
for courses and distances and stakes upon the ground and the
maple corner of lots Nos. 11, 12 and 15. The supposed lines
of the Marstiller survey have since been run by Coberly, the
present county surveyor, and he testifies, in this case, that he
found timber all around the lot as located by the defendant,

bearing marks corresponding in date with the Marstiller survey. Another circumstance relied upon to show the location of Lot No. 14, in accordance with the claim of the defendant, as conveyed by Yocum, is the relation thereof to a tract of land known as the Arnold and Taylor tract, as shown by Marstiller's plat. The commissioner said in his report that this Arnold and Taylor land covered a part of Lot No. 22, and had been taxed and was, therefore, not subject to sale. Accordingly, only so much of Lot No. 22 'was sold as was not covered by the Arnold and Taylor land. The Marstiller plat and report show that the Arnold and Taylor land, a long narrow strip, composed of two adjacent tracts, crosses Lot No. 22 diagonally, leaving only a small portion of the northwest corner and a large portion of the eastern and southern parts uncovered. As platted in connection with the Goff plat, this Arnold and Taylor survey bears an entirely different relation to Lot No. 22. Said lot goes farther north and east upon the Arnold and Taylor land. All this imports that the surveyed location of Lot No. 14, not as Goff conveyed it to Jarvis, but as Yocum conveyed it to Baker, and Baker to Mylius, commences at the maple, located at the eastern terminus of the interior line, run from west to east, to a point near the center of Lot No. 11. Lot No. 13 lies immediately east of Lot No. 14. Goff conveyed this to John Wyatt. Wyatt conveyed it to Carr, and Carr a portion of it, along with a portion of Lot No. 23, to Jennings Brothers, and the Jennings' to defendant, The Raine-Andrew Lumber Co. The defendant purchased the 743 acres conveyed by Mylius to Charles Kupfer out of the northern end of lots Nos. 14 and 15, by deed dated March 1, 1891. The deed from Mylius to Kupfer refers to what is called the Sherwood Plat and conveys lots Nos. 8, 9, 10 and 11, as designated on said plat. This plat seems to conform to the location of Lot No. 11 and lots Nos. 14 and 15, as contended for by the defendant. It is also said that Mylius represented to the agent of the defendant company, before it purchased from Kupfer, that lots Nos. 11, 14 and 15 were to be located by reference to the maple contended for by the defendant as the corner. After the partition between Mylius and Kupfer, there was some apprehension, on the part of the latter, of loss of a part of the land conveyed to him by superior outstanding title and Mylius

covenanted to make the loss good in that event. Mylius also conveyed to Nancy Dyer a portion of lots Nos. 11, 14 and 15 by a deed in which he recognized the line of the land conveyed by him to Kupfer, and by Kupfer to the defendant company. Lot No. 15 had originally been conveyed to the Bakers by Squire B. Ward and the Bakers conveyed to Mylius. In the deed from Ward to Baker, Lot No. 15 is described as cornering on two hemlocks and a service, just as in the Goff plat. If Lot No. 14 is located according to the Goff plat, the land conveyed to Kupfer, if located in Lot No. 14, as located by the Goff plat, would, so far as we can see from the evidence, seem to cover the land in controversy here and give title to the defendant, for this controverted land lies in the northern portion of Lot No. 14, as so located. Lots Nos. 10 and 11, of the Sherwood plat, seem to be also in the northern end of Lot No. 14, but the evidence shows, that, notwithstanding this, they are actually located, for the most part, west of Lot No. 14, according to the Goff plat. Mylius conveyed these lots as if they were in Lot No. 14, when, in point of fact, they are not, if it is to be located by the Goff plat, but are, if it is to be located according to the survey apparently made for the deed in the Yocum land sale proceeding. In addition to these circumstances, Mylius, in his testimony, admits that, in his dealings with Farnsworth and Kupfer, they recognized the maple corner as contended for by the defendant. When asked if his conveyance to Kupfer stated the truth, when it called for the northern line of lots Nos. 14 and 15, as laid off by Goff, he admitted that this was, in part a mistake, and said "part of the land that is true, but not as to all the northern part of No. 15 as laid down by Goff. It is all of No. 15 as laid down by the Sherwood plat;" and further, speaking of Kupfer, "When we divided the land he got the best part of the land and on account of the discrepancy at this maple he would not take up here. Neither would Farnsworth, and he taken his share under the Sherwood plat and then give me a contract that I was to have—I would not divide any way— anything outside, north of that line—of the deed of the lot as laid down by Sherwood—of the northern and eastern line." It is shown that Mylius pointed out the maple corner as claimed by the defendant to the defendant's agent, as being the corner

of lots Nos. 11, 12, 14 and 15. There is much evidence by conduct and admission of his recognition of this as the true corner.

Five instructions were given at the instance of the plaintiff, over the objection of the defendant, all of which embody the theories of the plaintiff already stated. Instruction No. 1 told the jury that, in locating Lot No. 14, they should ascertain it to be located at the place indicated on the Goff plat, unless they should believe from the evidence Goff had actually surveyed it and designated the lines and corner thereof from such actual survey. Instruction No. 2 told them that, if they should believe, from the evidence, Goff had actually surveyed Lot No. 11 and thereby designated the lines and corners thereof, and did not actually survey, but only designated the location of, Lot No. 14, by a plat thereof in connection with all the other lots, the plat of said Lot No. 14 must govern the location thereof, and that the actual survey of Lot No. 11 does not control the location of Lot No. 14. It is to be observed here that Goff's report shows he actually ran three lines of Lot No. 11 and marked all four of the corners thereof on the ground. Instruction No. 3 told the jury that, if they believed from the evidence Goff had done such surveying upon the ground, as to identify the whole 19,000 acres, and then made a plat thereof, showing the subdivisions thereof into lots, and made the plat a part of the record of his proceedings, the plat so made must govern the location of the lots shown thereon, unless they should believe Goff, as part of the same transaction, actually surveyed the lots, or some of them, and, by such actual survey, designated the lines and corners of the lots so surveyed, such survey should not control the locations of the lots not actually surveyed, but that they should be located by the plat. Instruction No. 4 told them that, if they should believe from the evidence the outside boundary of the whole tract was correctly shown by the plat lines on the plat used in the trial, and that Goff did not actually survey any of the lots or subdivisions shown on said plat except Lots Nos. 1 and 11, as shown by the red lines upon said plat, (the locations claimed by the defendant, a considerable distance south and west of the locations as claimed by the plaintiff), and designated all of the other lots shown upon said plat without having actu-

ally surveyed the same, they should be governed in the location of any of the lots shown upon said plat, other than lots Nos. 1 and 11, by the plat, made by Goff. Observe here that Goff's report shows he ran all the lines of Lot No. 1 and three of the lines of Lot No. 11, as stated. Instruction No. 5 told the jury that, if they believed from the evidence Goff actually surveyed Lot No. 11, and located it upon the ground in accordance with the claim of the defendant, but, by mistake, located it 162 poles farther south than it should have been located, as shown by his plat, the mistake in the location of Lot No. 11 does not control or govern the location of Lot No. 14, as made by him.

The purpose of these instructions was to controvert and nullify the claim of the defendant that the mistake or discrepancy indicated by the evidence must have the legal effect, if established, of shifting the location of all the lots on the plat about 162 poles to the south and 100 poles to the west, and thereby throwing Lot No. 14 almost entirely without the bounds of the disputed territory. Although they laid the basis or ground work of power in the jury to destroy this contention of the defendant, it is obvious that the court could properly give them, if the evidence tended to support the hypotheses embodied in them, and they were not forbidden by any rule of law, nor other evidence in the case. That there was evidence to sustain them is beyond doubt. The exterior boundaries of the whole tract, as shown on the Goff plat, are indicated by evidence found upon the ground, as we have shown. The exterior lines, with their courses and distances, must be located by the jury in accordance with the Goff plat, if they believe this location is correct. In settling this question, they could give effect to admitted corners and the courses and distances. The exterior lines of the Goff plat seem to be the lines of the old grant. The contradiction and inconsistency relate to the lines run and marked on the ground by Commissioner Goff and seemingly ignored or disregarded in his plat, if the admitted original corners are correct locations. There is strong evidence that the exterior lines are governed and controlled by the plat; but, in locating lots, actually surveyed, the marked lines necessarily control the plat. Every portion of the description of Lot No. 14, except the southwestern corner, is

found on the plat and not elsewhere. There is no evidence of their ever having been marked upon the ground. It follows, therefore, that the north, south, east and west lines rest upon nothing but the plat, which, in the main, is based on the exterior lines. These lines were first fixed. They were established before the delinquency or sale—before the issuance of the patent—and presumably rest upon an actual survey then made, while some of the interior lines were never surveyed. By courses and distances, Lot No. 14 can be reached and located from the exterior lines. The maple in controversy is not the sole, nor the best, index to its location. Though the maple if standing and identified, would be a natural object, marked as a corner, it would not be superior in any sense to the other natural monuments found in the exterior lines, plainly indicating a location of Lot No. 14 at a place different from that indicated by the maple. If the surveyor made the maple the corner of Lot 11, and erroneously described it as the corner of No. 14, never having run the lines of that lot nor located its corner, nor made any corner at that place by any mark upon the ground, we know of no rule of law which forbids a finding of the jury in accordance with the fact, whatever the result may be to the parties.

These instructions are, in a certain sense, a concession to the defendant. They tell the jury they may depart from the plat in certain respects. At the same time, they warn them against doing violence to the descriptive matter in the deed further than is necessary to adjust it to the surveying actually done. The objection to them seems to rest upon the view that, on establishing the east and west line as claimed by the defendant, the jury must then reconcile the conflict, not in location, but in effect, between this line and the established outer lines, by making the former prevail over the latter and destroy their effect. We do not understand this line of argument. If the jury are satisfied the outer lines of the plat are based upon admitted corners and were made without reference to inconsistent surveying actually done, they are bound to make this application and find accordingly. If, in addition to this, they find certain interior lines on the plat do not correspond with lines surveyed upon the ground, what rule of law says they shall then determine that they shall

prevail over other lines equally well, if not better, established in another portion of the plat? We are not aware of any, nor has any been brought to our attention. On the contrary, it is well established that, in this state of the evidence, the jury are at liberty to find that, in making the plat and deed, the survey was disregarded. On this subject we cannot do better than quote the law as declared in *Mining & Mfg. Co. v. Coal Co.*, 8 W. Va. 406, points 1 to 5 inclusive, of the syllabus of which are as follows: "Generally, when, in a deed, lines and corners are described, or when from the statement of courses and distances or other descriptions, in connection with circumstances existing and manifest, or ascertainable, at the time of the execution of the deed, it is presumable that such lines or corners are those referred to in the deed, the statement of courses and distances is, in construction, controlled by the actual lines and corners referred to. But the mere circumstance that lines and corners · are known to have been run and marked, or are found marked near where the courses and distances mentioned in the deed run, is not conclusive that they are the lines and corners of the land referred to in the deed. And when there is no such approximation in the course or length of the lines, or the marks on the corners, to the description in the deed, as to warrant the presumption that they are the boundaries of the land to which the deed relates, such marked lines should be disregarded. Lines and corners may be marked 'with the purpose to adopt them in a contemplated deed; but afterwards the marked lines and corners may be abondoned, and mere courses and distances from certain objects or points may be substituted. There is no uniform rule that the length of one line, as mentioned in a deed, shall control the course of another line, or that the latter shall control the former. Other circumstances will determine the adoption of the one or the other. Though the quantity of the land mentioned in the deed, will not control the boundary, when ascertained by the description, with other paramount circumstances, nevertheless, the correspondence of quantity given by a line in question, with the quantity mentioned in the deed, or an approximation to such correspondence, may be considered as tending to establish such line as the true one."

But this does not dispose of the ruling on these instructions.

We have said there is nothing in the law which precluded the submission of the hypotheses they state, on the evidence relating to the Goff plat and the actual surveying done by Goff. But there was other evidence in the case, of which they take no notice. The plaintiff, Mylius, does not claim Lot No. 14 under any deed made by Goff directly to him or to any one from whom he purchased. He derives his title from the deed made by Yocum, commissioner of school lands. As we have seen, there is a claim that the deed, when applied to its subject matter, locates the land it conveys in accordance with the contention of the defendant. Although it contains no call for any marked trees or other natural monuments and makes no reference to the Goff deed or plat, there is evidence in the case showing the existence of trees, evidently marked about the date of the survey made by Marstiller in the Yocum land sale proceeding, and these trees stand on lines traced from the maple, claimed by the defendant, as the corner of Lot No. 14, agreeing with the courses and distances recited in the deed from Yocum to Baker. This evidence of an actual tying down upon the ground at this place of the land conveyed by Yocum is not found in the deed, and it is to be taken in connection with some additional facts. Yocum, the commissioner of school lands, instituted his proceeding for the sale of lots Nos. 14 and 22 of the Goff sale. In his report to the court, he so describes the land and so does the surveyor in his report of survey. The decree of sale refers to the report and plat. The commissioner, in his report of sale, describes the lot sold as Lot No. 14 and the court confirmed the sale and directed a deed to be made, and the deed refers to the court proceedings. On this evidence, the defendant founds the contention that these instructions do not cover the entire case, but on the contrary completely ignore, and shut out from view of the jury, evidence and factors in the case, highly important to the defendant. That they take no notice of it is obvious, but we think it alone constitutes no defense and did not justify the giving of an instruction for the defendant. Conceding the facts to be established, it shows two repugnant descriptions, disclosed by extrinsic evidence, one of which is general and true, the other particular, by metes and bounds, but false. The state owned the Goff Lot No. 14, but no part of Lot No.

15.   The latter has never been forfeited or delinquent, since the conveyance by Goff, so far as the record shows. At the time of the Yocum conveyance, it was owned by the Bakers, one of whom purchased No. 14 from Yocum. These lots were adjacent. The true location of the latter is east of the former, the false description, if followed, would locate it almost wholly within Lot No. 15, which the state, the vendor, did not own, and which Baker, the vendee, did own, at the time of the Yocum sale. In all such cases, the false description must be rejected. The criterion for the construction of a deed is the intention of the parties. *Chapman* v. *Coal Co.*, 54 W. Va. 193, 199; *McDougal* v. *Musgrave*, 46 W. Va. 509. Of course there must be some language in the deed, disclosing the intention adopted. It cannot be read into the instrument, in the absence of words indicating it. Here, we have terms indicating Lot No. 14, located by the Goff plat, as the subject of conveyance. We have also, in the description by metes and bounds, aided by extrinsic evidence, terms indicating other land as the subject of conveyance. It is obvious that the vendor did not intend to sell, nor the vendee to buy, the latter, because the former did not own it, and the purchaser did already own it. Therefore, as applied to the subject matter, the description of the lot by name, in the record of the proceedings under which the deed was made, is a true description and the only one that will carry into effect the obvious intention of the parties. In cases of repugnance in description, when both apparently apply, that which is most certain prevails. When a deed contains two contradictory descriptions of the same premises, one of which is particular and definite, showing the precise location and bounds of the land, and the other general in its terms, the former controls, because that description which undertakes to set out the specific boundary is more likely to have been carefully attended to by the parties and, therefore, to reflect their real intention, than the general one, but this principle is operative only in those cases in which either description may be taken without doing violence to the manifest intention of the parties. It does not apply when one of the descriptions is baldly false and must have been inserted by mistake. A description of a town lot by its number and the number of the block, followed by a description by metes and bounds, in

cluding only a part of it, carries the whole lot. *Rutherford* v. *Tracy*, 48 Mo. 325; *Masterson* v. *Munro*, 105 Cal. 431. A conveyance describing the land as the grantor's home farm, and then setting out a particular description of the parcel of which it is composed, but omitting several acres, passes the whole farm. *Andrews* v. *Pearson*, 68 Me. 19; *Marshall* v. *McLean*, 3 Ia. 363. A description of a lot by number will control a reference to adjacent streets. *Nash* v. *Railroad Co.*, 67 N. C. 413. See generally *Baxter* v. *Tanner*, 35 W. Va. 60; *Smith* v. *Chapman*, 10 Grat. 445; *Heaton* v. *Hodges*, 14 Me. 66, 30 Am. Dec. 731, and note; *Nash* v. *Railroad Co.*, 67 N. C. 413; Devlin on Deeds, secs. 1017-1020. This law fits this case exactly. The description by metes and bounds covers only part of the land, owned by the grantor, the general description covers all of it. The facts being uncontroverted, the construction of a deed is a question for the court, not the jury. *Snooks* v. *Wingfield*, 52 W. Va. 441. Hence, if the court had been asked to instruct the jury, concerning the construction of the deed, in the light of the evidence, tending to show that it contemplated conveyance of the land, located otherwise than by the Goff plat, it would have been compelled to say the jury could not do so, and that they must treat it as calling for Lot No. 14 of the Goff sale and locate the land accordingly.

The next inquiry is whether the evidence of admissions, and representations already mentioned, 'was such as to demand recognition in the instructions. If the evidence thus far analyzed were all the record discloses, it might not be material. But there is additional evidence which we think clearly renders it so. The defendant claims under two deeds, one or both of which may cover some parts of the alleged trespass or all of it. Whether they do or not depends upon the location of the lands granted by them. One of these is the deed from Jennings Bros., and the other the one from the plaintiff himself. The plat and evidence disclose two alleged locations of the land conveyed by the former, one almost wholly in lots Nos. 13 and 23 of the Goff plat and the other almost wholly in lots Nos. 14 and 22 of that plat, and the admissions of the plaintiff, made before the purchase from Jennings Bros. tend to establish the latter, provided the muniments of title leave

any uncertainty as to the boundary lines. Respecting the location of this land, the evidence and claims of the defendant are indefinite and vague, but there is probably enough to make the admissions material. However this may be, the plaintiff's own deed to the defendant clearly connects them with the issue. It covers land in the region of the trespass. Its boundaries are general and the quantity and location of the land it conveys in controversy. In his dealings with Farnsworth and Kupfer, the plaintiff proceeded upon the location theory of the defendant. It was then to his interest to place the lands he conveyed to them as far west and south as possible, and, in so doing, he asserted, by his conduct, exactly the opposite of his present contentions. Having separated his holdings from theirs by partition, it is now to his interest to press his claims northward and eastward as far as possible. His course respecting the land he conveyed to the defendant is the same that he pursued in his transaction with Farnsworth and Kupfer. The farther south and west he can locate that land, the more he will retain in the north. This attitude, however, was not hostile to Farnsworth and Kupfer. They shared in his acquisitions. To some extent, the observation applies to his relations with the defendant also. Inimical to its interests in the north, the plaintiff's representations and former contentions avail it in the south. The peculiar situation of the defendant compels it also to take inconsistent positions. It bought land of Jennings Bros., the location of which, to subserve some of its purposes, must be in Lots Nos. 13 and 23, and, to subserve others, in lots Nos. 14 and 22. This may account, in part, for the failure to develop fully the evidence, relating to these lands as well as the tract it obtained from the plaintiff, constituting the real issue in the case. On this issue, namely, whether the trespass is covered by either or both of the conveyances to the defendant, the admissions of the plaintiff are relevant and material.

The description of the land in the deed from the plaintiff to the defendant, reads as follows: "All that portion of his (plaintiff's) land lying on Shaver's and Middle Mountain in said Randolph county, which is situated and which lies on the East side of Glady Fork and bounded on the West by said Glady Fork, on the North by Carl Kupfer land, on the East

by the Jennings-Carr land and on the South by the Fridley
land." This includes all the land between Glady Fork and the
Jennings-Carr land and all South of the Kupfer land, both
now owned by the defendant, but the Kupfer land does not
lie north of the trespass. It lies south and east of it, for the
most part. The defendant says the deed conveys only two or
three acres, if limited by the Kupfer land on the north, a
quantity entirely disproportionate, in its opinion, to the pur-
chase money, $1,650.00, and wholly at variance with plaintiff's
representations as to identity and quantity, carrying all the
land he had lying east of Glady Fork, amounting to 160 acres.
This statement suffices, we think, to show the materiality of
the representations, the descriptions in these two deeds and
the evidence, respecting the location of the lands conveyed
by them, none of which is referred to by any instruction given
in the case.

It bears more directly on the real issue than that relating
to the identity and location of the lots of the Goff plat and
conveyances. The trespass may be in Lot No. 14 and yet
belong to the defendant. Hence, the location of that lot
is not at all conclusive, nor necessarily vital in the case.
Nevertheless, the instructions given apply to it only, and leave
wholly out of view that which is more decisive in character.
They also repeat the same proposition several times in differ-
ent forms. Thus they gave undue prominence to partial and
inconclusive evidence, and were obviously liable to mislead
the jury. Though not binding in form or effect, they were
so drawn as to make the hypothesis embodied in them appar-
ently controling, and, in our opinion, this was highly pre-
judicial. On the trial of an issue as to which there is conflict
in the evidence, the instructions, if any, should submit the
conflicting theories the evidence tends to prove. Presentation
of one of them and silence as to the other virtually amount
to a comment on the evidence. While the instructions are
usually prepared by the attorneys, they are the directions of
the court and must present the issues fairly. Ordinarily, this
result is accomplished by the work of the attorneys on both
sides, approved by the court, but presentation of both phases
is none the less necessary, when the instructions are prepared
by the attorney for only one of the parties or by the court.

Of course a case may properly be submitted without any at all, but, if instructions are given at the instance of anybody, they must present the case fairly, else the court, by its action, misleads the jury and thereby errs. *Delmar Oil Co.* v. *Bartlett,* 62 W. Va. 700; *Bice* v. *Wheeling Elec. Co.,* 62 W. Va. 685; *McMechen* v. *McMechen,* 17 W. Va. 683; *Storrs* v. *Feick,* 24 W. Va. 606; *Webb* v. *Packet Co.,* 43 W. Va. 800; *Fisher* v. *Railroad Co.,* 39 W. Va. 371. Thus viewed in the light of the evidence and the rules of procedure, the instructions, given at the instance of the plaintiff, were erroneous and prejudicial. They, or one of them, should have been so modified as to direct attention to the evidence we have been discussing, or an additional instruction, embracing it, should have been given along with them.

The refusal of the court to give two instructions requested by the defendant is ground of further complaint. By them the defendant attempts to apply here the rule declared in *Stockton* v. *Morris,* 39 W. Va. 432, requiring, in the case of what is called an inclusive grant, the plaintiff to prove the land he seeks to recover lies, not only within the boundaries of the grant, but also outside of the tract excepted from it. The grant to Philips excepted prior surveys containing 800 acres and declared that it should be no bar, in either law or equity, to the confirmation of the title of prior claimants to said 800 acres by grant. If nothing further appeared in the case, the rule invoked would apply, but another important element is disclosed. This whole tract of land, without any exception, was afterwards sold by the State in the proceeding instituted by Commissioner Goff. The deeds, made in that proceeding and conveying every particle of land within the boundaries of the original grant of 19,000 acres, constituted a new grant by the State, without exception. Had the state any title to the land excepted from the original grant? Certainly, if the excepted surveys were never granted, but such title did not accrue from forfeiture of the Philips grant, which did not include them. The state still held her title as sovereign, provided the excepted surveys had not been subsequently granted. Did the Goff deeds pass that title? No, for the lands were waste and unappropriated, which commissioners of the revenue had no power to sell. They were not subject

to sale by judicial procedure, as delinquent and forfeited lands were.   They passed only by survey, entry and grant.   Code of 1819, Vol. 1, ch. 86, Code of 1849, ch. 112.   For that reason, the deed of a commissioner of the revenue would not pass them.   *Levasser* v. *Washburn,* 11 Grat. 572.   No statute vested jurisdiction in the court, or conferred authority upon the commissioner, to dispose of them in that way.   But the Goff deeds covered this land, and were defective only in respect to authority to convey a particular title.   The legislature had power to remedy this defect and did so by the curative and validating provision of section 19 of chapter 105 of the Code of 1906, saying "Whatever right, title, interest and estate the state of West Virginia had to any lands at the date of the sale thereof, or instrument purporting to convey the same heretofore made by said state through and by the commissioner of school lands of any county, under an order or decree of the circuit court in any suit or proceeding under said chapter one hundred and five of the Code, however derived or claimed, shall be deemed and held to have passed to and vested in the grantee thereof; whether the land so sold was proceeded against as forfeited, escheated, or waste and unappropriated land, notwithstanding any irregularity or error in such proceeding or informality in such sale or conveyance or purported conveyance, or want of jurisdiction in the court to decree such sale."   This clearly validates the Goff deed and makes it pass this land as waste and unappropriated.   The deed did not do so of itself on account of lack of jurisdiction or power in the court to sell it as such, but this statute declares the deed shall do so, notwithstanding the want of jurisdiction or the form of the sale or proceeding.   It operates as a legislative release or transfer of state title to the grantee in deeds which did not pass it, because of lack or prior authority in the state's selling agents to do so.   This conclusion is within both the letter and the spirit of the statute.   So interpreted, it makes a just and equitable provision for a meritorious case and is in perfect accord with the prior and subsequent policy of the legislature respecting the public domain and land titles emanating from the state. *State* v. *West Branch Lumber Co.,* 64 W. Va. 673; *State* v. *Snyder,* 64 W. Va. 659; *State* v. *Jackson,* 56 W. Va. 558;

*Coal Co.* v. *Howell,* 36 W. Va. 489; *McClure* v. *Maitland,* 24 W. Va. 561; *State* v. *Harman,* 57 W. Va. 447; *State* v. *King,* 64 W. Va. 545. 546. 610. Can the want of jurisdiction relieved from by this provision be other than such as appears here? To say it means want of jurisdiction of the former owner of the land would make the clause very narrow in its effect and of little or no practical value. To make it cover this defect of authority relieves the state of the injustice and embarrassment of holding title against her own grantee, rendering it necessary for him to give up the land or buy it over again from her, in the same way and from the same state agencies through which he had already purchased it, there having been no other mode of disposition thereof at the date of the passage of the act nor since. We may well suppose the legislature intended to provide against a consequence so anomalous, unjust and inimical to the prosperity of the state, and the terms used in this clause clearly express such intent. The provision quoted is from the section, as amended by chapter 42 of the Acts of 1905. As it stood immediately before that amendment was made, it was more direct and specific as to the intent, leaving no possible ground for doubt. See sec. 19, ch. 105, Code of 1899.

Another view of the case sustains the action of the court in refusing this instruction. Lot No. 14, in which the trespass may be, and part of Lot No. 22, were subsequently conveyed by Yocum, commissioner of school lands, in 1879, under a decree in a school land proceeding, and under a statute materially different from that under which the Goff sale of the same land had been made. Chapter 134 of the Acts of 1872-3, in force at the date of that proceeding, sale and conveyance, provided for the disposition of waste and unappropriated lands in the same manner as forfeited and purchased lands. That method of disposing of them was adopted about the year 1865, and has been maintained ever since. Section 8 of chapter 105 of the Code of 1868 provided that the deed, in such a proceeding, should pass "all the interest of the state" in the lands thereby conveyed, not merely such title as had been acquired by forfeiture or the particular forfeiture ascertained in the cause. The Yocum deed, therefore, clearly passed any title the state had at the date thereof,

and, if the land excepted from the Philips grant had not been previously granted, the state's original title to Lot No. 14 and part of Lot No. 22, as sovereign, was thereby conveyed to Baker. No prior grant thereof has been shown. If it had been, it would have been superior to these school land deeds and the rule in question no doubt applicable; but, in the absence thereof, we think it clearly inapplicable and the rejection of the instruction proper.

Exception was taken to the admission of the opinion of a surveyor who had run certain exterior lines of the 19,000 acre tract, to the effect that the lines thereof, laid down on the surveyor's plat, were the true lines. Ordinarily, such evidence is inadmissible. The location of boundary lines is not a subject for expert testimony. It always depends upon facts and circumstances which the jury are presumed to be capable of understanding without the aid of expert testimony. The court should have excluded this statement.

Complaint is also made of the admission of an agreement between Mylius and Kupfer, whereby the former bound himself to compensate the latter for any land he might lose out of that conveyed to him by the partition deed, by reason of conflict between it and another tract of land, known as the Hare land. Mylius put this agreement in evidence to negative the effect of his admission, arising by implication from his transactions with Kupfer, and as a part of his conduct relating to the location of the lands as conveyed by Goff. We perceive no error in the admission thereof. It properly goes to the jury with all the evidence of admissions and conduct, bearing on the questions of location.

For the error in giving plaintiff's instructions in the form in which we find them in the record, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and Remanded.*